Elisa Y. Lee (Cal. State Bar No. 348087)
**LAW OFFICE OF ELISA Y. LEE**
47 W. Polk St. Suite 100-210
Chicago, IL 60605
Phone: 312-500-2120
Fax: 312-312-9690
elisa@elisaleelaw.com

Attorney for Defendant
CASEY GOONAN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CASEY ROBERT GOONAN,<br><br>Defendant. | Case No. 24-CR-00414-JSW<br><br>**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255; REQUEST FOR EVIDENTIARY HEARING**<br><br>Date: TBD<br>Time: TBD<br>Place: TBD |

# TABLE OF CONTENTS


INTRODUCTION .......... 7

PROCEDURAL AND FACTUAL BACKGROUND .......... 8

28 U.S.C. 2255 .......... 23

ARGUMENT .......... 24

I. MR. GOONAN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO ASSERT HIS DUE PROCESS RIGHTS AND MOVE FOR DISQUALIFICATION OF ALL JUDGES IN THE OAKLAND FEDERAL COURTHOUSE .......... 25

A. Background Legal Principles .......... 25

1. Due Process Requires Disqualification of a Judge if Circumstances Objectively Create the Risk of Bias or an Appearance of Bias .......... 25

2. A Due Process Violation of the Right to a Fair Tribunal is Structural Error. 28

3. The Judicial Disqualification Statute, 28 U.S.C. § 455, Requires Recusal Under the Same Objective Standard as the Due Process Analysis .......... 31

4. Courts Consistently Have Held That Disqualification Is Required When Judges and Judicial Staff are Victims or Intended Victims of the Alleged Crime32

B. The Ineffective Assistance .......... 38

II. MR. GOONAN'S COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO ENSURE THAT HIS CONSENT TO A BIASED JUDGE WAS UNEQUIVOCAL, KNOWING, INTELLIGENT, AND VOLUNTARY, AND THAT HIS WAIVER WAS PERSONALLY MADE IN COURT ........ 42

A. Background Legal Principles ........ 42

1. Mr. Goonan Did Not Unequivocally, Knowingly, and Intelligently Waive His Right to an Impartial Judge ........ 42

2. Mr. Goonan Did Not Personally Waive His Basic Right to an Impartial Judge ........ 46

B. The Ineffective Assistance ........ 50

III. EVEN IF MR. GOONAN HAD WAIVED HIS RIGHT TO AN IMPARTIAL JUDGE (WHICH HE DID NOT), A BIASED JUDGE MAY NOT EXERCISE DISCRETION IN SENTENCING AND THE RESULTING PREJUDICE TO MR. GOONAN IN HIS EXCESSIVE SENTENCE IS CLEAR ........ 53

# TABLE OF AUTHORITIES

## CASES

*Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389 (1937) .......... 43
*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) .......... 27
*Arizona v. Fulminante*, 499 U.S. 279 (1991) .......... 30, 49
*Barker v. Wingo*, 407 U.S. 514 (1972) .......... 43, 50
*Bracy v. Gramley*, 520 U.S. 899 (1997) .......... 25, 26
*Brady v. United States*, 397 U.S. 742 (1970) .......... 43
*Brookhart v. Janis*, 384 U.S. 1 (1966) .......... 48
*Brown v. United States*, 583 F.Supp.2d 1330 (S.D. Ga. 2008) .......... 23
*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) .......... 25, 26, 27, 28
*Carnley v. Cochran*, 369 U.S. 506 (1962) .......... 43
*College Savings Bank v. Florida Prepaid Postsecondary Educational Expense Board*, 527 U.S. 666 (1999) .......... 50
*Correll v. Ryan,* 539 F.3d 938 (9th Cir. 2008) .......... 25
*Cross v. United States*, 325 F.2d 629 (D.C. Cir. 1963) .......... 48
*Daniels v. United States*, No. 4:23-CV-04142-KES, 2024 WL 6845366 (D.S.D. Apr. 30, 2024), *report and recommendation adopted*, No. 4:23-CV-04142-KES, 2024 WL 6845361 (D.S.D. May 30, 2024) .......... 59
*David v. United States*, 134 F.3d 470 (1st Cir. 1998) .......... 73
*Doughty v. State*, 470 N.E.2d 69 (Ind. 1984) .......... 48
*Duncan v. Louisiana*, 391 U.S. 145 (1968) .......... 48
*Faretta v. California*, 422 U.S. 806 (1975) .......... 43, 44
*Florida v. Nixon*, 543 U.S. 175 (2004) .......... 48
*Gall v. United States*, 552 U.S. 38 (2007) .......... 61
*Gonzalez v. United States*, 553 U.S. 242 (2008) .......... 46
*Heflin v. United States*, 358 U.S. 415 (1959) .......... 23
*Hill v. Lockhart*, 474 U.S. 52 (1985) .......... 53
*Hill v. United States*, 368 U.S. 424 (1962) .......... 23
*Hook v. McDade*, 89 F.3d 350 (7th Cir. 1996) .......... 36
*Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014) .......... 26
*In re Murchison*, 349 U.S. 133 (1955) .......... 26, 27, 28
*In re Nettles*, 394 F.3d 1001 (7th Cir. 2005) .......... 35, 36, 37
*Johnson v. Zerbst*, 304 U.S. 458 (1938) .......... 43, 48, 50
*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .......... 39
*LoCascio v. United States*, 473 F.3d 493 (2d Cir. 2007) .......... 32

*Mann v. Ryan,* 774 F.3d 1203 (9th Cir. 2014) .......... 25
*McCoy v. Louisiana*, 584 U.S. 414 (2018) .......... 49
*Neder v. United States*, 527 U.S. 1 (1999) .......... 30
*New York v. Hill*, 528 U.S. 110 (2000) .......... 46, 47, 48
*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) .......... 34, 35, 37
*Offcutt v. United States*, 348 U.S. 11 (1954) .......... 28
*Padilla v. Kentucky*, 559 U.S. 356 (2010) .......... 51
*Patton v. United States*, 281 U.S. 276 (1930) .......... 49
*Preston v. United States*, 923 F.2d 731 (9th Cir. 1991) .......... 32
*Reeves v. Belleque*, 214 Fed. Appx. 667 (9th Cir. 2006) .......... 54
*Reeves v. Belleque*, No. CV 05-505-MA, 2010 WL 3418121 (D. Or. Aug. 23, 2010) .......... 54, 55
*Rippo v. Baker*, 580 U.S. 285 (2017) .......... 26, 27
*Rodriguez v. Copenhaver*, 823 F.3d 1238 (9th Cir. 2016) .......... 33
*Roe v. Flores-Ortega*, 528 U.S. 470 (2000) .......... 42
*Rose v. Clark*, 478 U.S. 570 (1986) .......... 30, 39, 41
*Strickland v. Washington*, 466 U.S. 668 (1984) .......... 24, 38, 40, 41
*Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008) .......... 41
*Taylor v. Illinois*, 484 U.S. 400 (1988) .......... 47, 48
*Tumey v. Ohio*, 273 U.S. 510 (1927) .......... 26, 49
*United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019) .......... 63
*United States v. Blanco*, 102 F.4th 1153 (11th Cir. 2024) .......... 62
*United States v. Booker*, 543 U.S. 220 (2005) .......... 36
*United States v. Camiscione*, 591 F.3d 823 (6th Cir. 2010) .......... 61
*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993) .......... 34
*United States v. Cronic*, 466 U.S. 648 (1984) .......... 39
*United States v. Dandy*, 998 F.2d 1344 (6th Cir. 1993) .......... 27
*United States v. Erskine*, 355 F.3d 1161 (9th Cir. 2004) .......... 44
*United States v. Gunter*, 620 F.3d 642 (6th Cir. 2010) .......... 61
*United States v. Hayes*, 231 F.3d 1132 (9th Cir. 2000) .......... 44, 45
*United States v. Holland*, 519 F.3d 909 (9th Cir. 2008) .......... 27, 32, 37
*United States v. Howard*, 381 F.3d 873 (9th Cir. 2004) .......... 73
*United States v. Jordan*, 915 F.2d 622 (11th Cir. 1990) .......... 23
*United States v. Kyle*, 734 F.3d 956 (9th Cir. 2013) .......... 74
*United States v. Lewis*, 392 F.2d 440 (4th Cir. 1968) .......... 23
*United States v. Macklin*, 523 F.2d 193 (2d Cir. 1975) .......... 49

*United States v. Olano*, 507 U.S. 725 (1993) ..... 46
*United States v. Partin*, 601 F.2d 1000 (9th Cir. 1979) ..... 45
*United States v. Reznicek*, No. 21-2548, 2022 WL 1939865 (8th Cir. June 6, 2022) ..... 67
*United States v. Robinson*, 967 F.2d 287 (9th Cir. 1992) ..... 23
*United States v. Rodrigues*, 347 F.3d 818 (9th Cir. 2003) ..... 73
*United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995) ..... 63
*United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) ..... 23, 25
*United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992) ..... 50
*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ..... 62
*United States v. Wilmer*, 595 F. App'x 685 (9th Cir. 2014) ..... 40
*United States v. Withers*, 638 F.3d 1055 (9th Cir. 2011) ..... 23, 42, 73
*Weaver v. Massachusetts*, 582 U.S. 286 (2017) ..... 30, 31, 41
*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ..... passim
*Withrow v. Larkin*, 421 U.S. 35 (1975) ..... 26, 28

**STATUTES**

18 U.S.C. § 3553 ..... 56, 57, 59, 64
18 U.S.C. § 3621 ..... 34
18 U.S.C. § 844 ..... 8
26 U.S.C. § 5861 ..... 9
28 U.S.C. § 2241 ..... 33
28 U.S.C. § 2255 ..... 23
28 U.S.C. § 455 ..... 31, 34, 42

## INTRODUCTION

This proceeding under 28 U.S.C. § 2255 arises from Casey Robert Goonan's conviction for Damage and Destruction by Fire/Explosive of Property Used in Interstate Commerce, 18 U.S.C. § 844(i), and his sentence of 235 months imprisonment. Mr. Goonan was arrested on June 17, 2024, after a series of incidents that began when he set a U.C. Berkeley police vehicle on fire with Molotov cocktails on June 1, 2024. On July 24, 2024, he was indicted in this Court on three counts relating to the June 1 police car incident.

The case was assigned to Senior District Court Judge Jeffrey S. White. Less than six months after Mr. Goonan's arrest, he signed a plea agreement in which he pled guilty to firebombing the police car and also admitted to four other uncharged acts, including a July 11, 2024, attempted firebombing of the Ronald V. Dellums Federal Building and United States Courthouse in Oakland, California—the very courthouse in which Judge White sits and in which Mr. Goonan's case proceeded.

On September 23, 2025, Mr. Goonan appeared before Judge White for sentencing. To Mr. Goonan's surprise, prior to imposing sentence, Judge White made impassioned statements of impermissible bias against Mr. Goonan, emphasizing that he viewed Mr. Goonan's case as "one of the most serious series of crimes that I have seen" particularly because it involved an "assault on . . . this very courthouse." This personal bias and emotional investment in Mr. Goonan's fate led Judge White to see Mr. Goonan's criminal acts in an excessively prejudicial light, resulting in his 235-month sentence that was demonstrably "greater than necessary" as evidenced by the fact that it was nearly four years longer than the government's own request; nearly five years longer than the Probation Office's request; and just five months short of the statutory

maximum—which also meant that Mr. Goonan received no benefit from his U.S.S.G. § 3E1.1 three-level reduction for early acceptance of responsibility.

Mr. Goonan moves the Court, pursuant to 28 U.S.C. § 2255, for an Order vacating, setting aside or correcting his sentence on the ground that it violates the Constitution and laws of the United States and is otherwise subject to collateral review. Specifically, Mr. Goonan received ineffective assistance of counsel, in violation of the rights guaranteed him by the Sixth Amendment, as well as his Due Process rights under the United States Constitution and 28 U.S.C. § 455, when his counsel:

- failed to move for disqualification of all judges in the Oakland federal courthouse;
- failed to ensure that Mr. Goonan's consent to a potentially biased judge was unequivocal, knowing, intelligent, and voluntary, and that his waiver was personally made in court; and
- proceeded to allow Judge White to exercise unchecked discretion in sentencing Mr. Goonan, and failed to object when Judge White expressed impermissible bias toward Mr. Goonan at his sentencing—a bias which led Judge White to inadequately consider the 18 U.S.C. § 3553(a) sentencing factors and impose an unreasonable sentence.

Each of these defects, standing alone, resulted in a serious miscarriage of justice and denial of due process for Mr. Goonan. Counsel's conduct fell below the standard of care established by *Strickland v. Washington*, 466 U.S. 668 (1984), by allowing who the government and Court viewed as the defendant's victims—the staff, including the judges as well as the security officers, of the courthouse building Mr. Goonan admitted to attacking—to participate in his sentencing.

## PROCEDURAL AND FACTUAL BACKGROUND

On July 24, 2024, Defendant Casey Goonan was indicted on one count of Damage and Destruction by Fire/Explosive of Property Belonging to Institution Receiving Federal Financial Assistance, 18 U.S.C. § 844(f)(1); one count of Damage and Destruction by Fire/Explosive of Property Used in Interstate Commerce, 18 U.S.C. § 844(i); and one count of Possession of

Unregistered Firearm, 26 U.S.C. § 5861(d). *See* Dkt. 11. The Indictment followed a June 26, 2024 Complaint that had been filed charging only the first count. *See* Dkt. 1. The three counts were all related to a single June 1, 2024 incident in which a U.C. Berkeley police vehicle had been set on fire with Molotov cocktails, for which Mr. Goonan had been arrested on June 17, 2024. *See id.*; Dkt. 11; Dkt. 18. Mr. Goonan was initially represented by the Federal Public Defender's office, but on July 26, 2024, formally retained private counsel Sarah Potter and Jeff Wozniak, who represented Mr. Goonan through sentencing. *See* Declaration of Casey Robert Goonan, attached hereto as Exhibit A, at ¶ 2.

The initial appearance took place on July 11, 2024 before Magistrate Judge Donna M. Ryu. Mr. Goonan was represented by Angela Hansen of the Federal Public Defender's Office, who informed the Court that Mr. Goonan would be retaining two private attorneys, including Jeff Wozniak. July 11, 2024 Transcript of Proceedings, attached hereto as Exhibit B, at 4:11–5:11. The Court set a status hearing on detention for July 18, 2024. Before the close of the July 11 hearing, AUSA Nikhil Bhagat engaged in this colloquy with the Court:

> MR. BHAGAT: There's one other thing I wanted to bring to the Court's attention just as a heads up. Part of our detention argument is going to be that Mr. Goonan on one occasion attempted to firebomb this building. No judicial officers were involved. That's my understanding. So I don't think that the Court would need to recuse itself, but I wanted to bring that to your Honor's attention before we make our argument.
>
> THE COURT: When did that allegedly happen?
>
> MR. BHAGAT: June 11th, your Honor.
>
> THE COURT: Of this year.
>
> MR. BHAGAT: Yes, your Honor. And the particular office was not a judicial office. I understand it was the U.S. Railroad Retirement Board.

THE COURT: In the main building?

MR. BHAGAT: Yes, your Honor, 12th and Jefferson.

THE COURT: U.S. Railroad –

MR. BHAGAT: U.S. Railroad Retirement Board.

THE COURT: Okay. I would like to have some time to just make sure, but from my perspective, the conflict does not -- we don’t have a conflict problem. Is the Government concerned about a conflict?

MR. BHAGAT: I am not, your Honor. No.

THE COURT: Okay. And -- well, is Government concerned that the judicial officer, meaning me, that I might have a conflict?

MR. BHAGAT: No, we’re not concerned that your Honor has a conflict, but I know that the canons are very, sort of, broad, and they talk about appearance of – that the impartiality might reasonably be questioned. So I wanted to just bring it to the Court’s attention, so that the Court had all the facts to make its own decision.

THE COURT: Understood. Ms. Hansen, I know you’re not representing him except for today for this initial appearance. So you tell me if this is something that’s beyond your -- the scope of what you can do today.

MS. HANSEN: It’s definitely beyond the scope.

THE COURT: Okay.

MS. HANSEN: And then I -- this is the first time we’re hearing about this. It might be helpful for Government counsel to reach out to the putative counsel for Mr. Goonan and to provide maybe more of a proffer report.

MR. BHAGAT: I’m happy to do that, your Honor.

THE COURT: That’s very helpful because if there is a concern, you know, I definitely want to hear it. While I look at my own ethics canons and what they dictate, it would be very important to me to know what the -- if the parties have that concern. And I would like to take care of that in advance.

MR. BHAGAT: Yes, your Honor.

THE COURT: So please reach out to Mr. Goonan's retained counsel. And I would like to know from -- can you -- I think we can do this by e-mail, just because Mr. – I think you said Wozniak, has not -- will not have made appearance by then. But perhaps you could reach out to him by e-mail, and then let me know, including Mr. Wozniak, on the e-mail chain what the Defense position is on that, just so I understand -- and -- if the party have -- if any party has a concern, okay?

MR. BHAGAT: Yes, your Honor. Of course.

THE COURT: Can you do that by -- please, by July 16, so two days before the appearance?

MR. BHAGAT: Yes, your Honor.

THE COURT: Thank you. Ms. Hansen, does that sound like a decent plan?

MS. HANSEN: It does. And I will convey all of this to Mr. Wozniak.

THE COURT: Okay. And the e-mail should go to Ms. Garcia.

MS. HANSEN: Yes, your Honor.

MR. BHAGAT: Yes, your Honor.

THE COURT: Okay? All right. Great. All right. Is there anything further, Mr. Bhagat?

MR. BHAGAT: No, your Honor.

THE COURT: Ms. Hansen.

MS. HANSEN: No, your Honor.

THE COURT: Okay. Mr. Goonan, I'll see you next -- a week from today, okay? Thank you.

Ex. B at 11:6–14:10. After the hearing, Attorney Hansen sent an email to Attorney Wozniak stating: "Hi Jeff, here's the complaint. It's unsealed. It is set for 7/18/24 at 10:30 a.m. in Oakland

for ID of counsel, status re detention and status re preliminary hearing. After court I will sit down and give you a full report from the appearance today. There's a possible judicial recusal issue (based on allegation he attempted to fire bomb an agency in the federal building), and the government alleges a presumption of detention under 3142(e)(3)(C)." July 11, 2024 Email from Angela Hansen to Jeff Wozniak, attached hereto as Exhibit C, at 1.

On July 15, 2024, Attorney Potter sent an email to AUSA Bhagat stating: "Just wanted to give you a status update on Goonan. I believe I will be making a special appearance on Thursday (but I think we are close to having the counsel issue resolved) and we do not intend to address detention at the moment so I think that sort of moots the recusal issue. Let me know if you think we need to give the judge any more specific information about anything or if there are other things you need me to address." July 15, 2024 Email from Sarah Potter to Nikhil Bhagat, attached hereto as Exhibit D, at 1.

Bhagat responded: "Hi! Thanks for the update—the judge did specifically ask (order?) that I send an email to her CRD re the recusal issue by tomorrow, so I think we should do that, however brief it is; I will draft something up and send to you for comments." *Id.* Later that day, on July 15, 2024, AUSA Bhagat filed a letter with the Court, addressed to Magistrate Judge Ryu, that stated in full:

> As previewed at Mr. Goonan's initial appearance on July 11, I write to advise the Court that at any detention hearing in this matter, the government's argument for pretrial detention will include a proffer of evidence tending to show that on June 11, 2024, Mr. Goonan arrived on foot on the 12th Street side of the Oakland federal building with a bag containing Molotov cocktails. He threw rocks at the glass facing the street, intending to break a window and toss one or more lit devices into an interior office. As he was throwing rocks at the window,[1] he was interrupted by a

[1] The damaged window was that of the office of the US Railroad Retirement Board.

> protective security officer. Mr. Goonan stopped throwing rocks and moved away from the officer, but as he did so, he placed the bag with Molotov cocktails inside a planter that abuts the 12th Street side of the building and lit it on fire before fleeing.
>
> Particularly given that there is no evidence that Mr. Goonan's actions were aimed specifically at the Court or the judiciary, the government does not believe that Your Honor's presiding over the detention hearing in this case would create an appearance of impropriety.
>
> Mr. Goonan's counsel has advised that Mr. Goonan intends to waive pretrial detention at the status conference on July 18. Given that intention, Mr. Goonan's position is that Your Honor need not consider or decide this issue until and unless at some future date, the Court reopens the detention hearing pursuant to 18 U.S.C. § 3142(f)(2).
>
> Please let me know if the Court has any additional questions or concerns.

Dkt. 7.[2]

At the July 18, 2024, status on detention hearing, again before Magistrate Judge Ryu, Attorney Potter entered a special appearance for Mr. Goonan. Attorney Potter represented to the Court that she was hoping to be able to make a general appearance in the case "by next week. We were going to ask to come back on the 26th, and my hope is that we will have that settled by then." July 18, 2024 Transcript of Proceedings, attached hereto as Exhibit E, at 3:3-5. The Court proceeded with "some detention and preliminary hearing arraignment." *Id.* at 3:6-7. Attorney Potter stated: "We're going to waive detention for now. We may raise it at a later date. But for today's purposes, we'll waive detention." *Id.* at 3:9-11.

> THE COURT: Okay. So I just wanted to note, I got a letter from Mr. Bhagat about the detention hearing. In the initial appearance, I

[2] Mr. Goonan was not provided a copy of this letter and did not know about it until this year, when undersigned counsel read its contents to him over the phone during a legal call. *See* Ex A. at ¶ 7.

> think -- we probably had a defender here. Let's see, it was Ms. Hansen –
>
> MS. POTTER: Ms. Hansen.
>
> THE COURT: -- back on July 11th. And at that time, Mr. Bhagat raised a -- I guess a potential conflict issue. He said in detention, part of the proffer was going to be about Mr. Goonan's alleged involvement in an attempt to I think – I'm not sure, plant a destructive device – do something to some part of this building. And he said he was raising it for your Honor in case there was a conflict about me. I said, well, let me hear from the Defense to see if they think there's a conflict. I -- just for the record, I don't have a conflict, but I -- and I know you're waiving now, so I don't know if you want to state your position on that in case it happens later –
>
> MS. POTTER: So I've spoken to Mr. Bhagat about this, and what we discussed was -- I haven't received any additional information about those allegations. I haven't seen any police reports or anything like that, just his representations as to what the evidence is.
>
> THE COURT: Okay.
>
> MS. POTTER: What we discussed was that if detention does come up --
>
> THE COURT: Okay.
>
> MS. POTTER: -- at a later date and we do review those materials, if something comes up in those materials that leads me to think that there may be a conflict, we would raise it at that time.
>
> THE COURT: Fair enough.
>
> MS. POTTER: As of this moment, I don't foresee that, but I don't know what the materials are going to show.
>
> THE COURT: Understood. Okay. So for now, Mr. Goonan, we're waiving detention and (indiscernible).

*Id.* at 3:14–4:23. The Court set July 26, 2024 as the next hearing date, for status on preliminary hearing, arraignment and attorney appointment. *See id.* at 5:2-18.

On July 26, 2024, Mr. Goonan's arraignment took place before Magistrate Judge Ryu, at which Attorney Potter entered a general appearance. *See* July 26, 2024 Transcript of Proceedings, attached hereto as Exhibit F, at 2:11-24. The conflict/recusal issue was not raised; the July 18, 2024 hearing would be the last time the issue was raised before the Court. Judge Ryu set the next court date for September 17, 2024, "in front of Judge Jeffrey White, who is your trial judge, and that would be for status on the case." *Id.* at 7:23–8:1.

The July 26, 2024 arraignment would be Mr. Goonan's last appearance in court until January 2025. The September 17 status hearing was continued by agreement of the parties until, on December 3, 2024, the parties filed a Joint Status Report notifying the Court that the "parties have reached an agreement-in-principle which, if accepted by the Court, provides that the defendant will plead guilty to Count Two of the Indictment. The parties respectfully request that the Court conduct a change of plea hearing on December 10, 2024 or as soon as possible thereafter, either on the Court's regular criminal calendar or by special setting." Dkt. 22 (footnotes omitted). Footnote 1 of the Joint Status Report stated: "Although the defendant will only be pleading guilty to Count Two of the Indictment, which relates to the UCPD vehicle, the parties anticipate that as part of that change of plea, the defendant will admit their involvement in other arsons and attacks, including a June 2024 attack on the Oakland federal building. *See generally* ECF No. 7 (Ltr. from AUSA Bhagat to Chief Magistrate Judge Ryu describing facts of Oakland federal building incident and setting forth parties' respective positions on issue of judicial recusal with respect to detention hearing)." *Id.* Pursuant to the parties' Joint Status Report and Proposed Order, Judge White vacated the then-scheduled December 10, 2024 status hearing and set a change of plea hearing for January 14, 2025. *See* Dkt. 23.

On December 12, 2024, Mr. Goonan signed the plea agreement, pleading guilty to Count Two of the Indictment, which charged him with Destruction of Property Used in Interstate Commerce by Fire or Explosion in violation of 18 U.S.C. § 844(i). *See* Dkt. 25 at 1. In the plea agreement, Mr. Goonan agreed that the statutory penalties as to Count Two were a minimum prison term of 5 years and a maximum prison term of 20 years. *See id.* at 2. Mr. Goonan also agreed to the application of U.S. Sentencing Guideline § 3A1.4, known as the "terrorism enhancement," which increased his Offense Level by 12 points to a total Offense Level of 33, after a three-level reduction for acceptance of responsibility; and raised his Criminal History Category from I to VI. *See id.* at 6-7. The government in turn agreed to recommend a sentence no higher than 188 months, unless Mr. Goonan violated the terms of the agreement or failed to accept responsibility. *See id.* at 11. Although the Guidelines range was not specified in the plea agreement, an Offense Level of 33 and Criminal History Category VI results in a Guidelines range of 235–293 months. *See* U.S.S.G. § 5A (Sentencing Table). Without the terrorism enhancement, Mr. Goonan's Guidelines range would have been 37–46 months. *See* Dkt. 65, Goonan Sentencing Memorandum, at 2. The plea agreement was signed by AUSA Bhagat and filed with the Court on January 14, 2025. *See* Dkt. 25.

As part of the plea agreement, in addition to pleading guilty to firebombing the U.C. Berkeley police vehicle on the morning of June 1, 2024, Mr. Goonan admitted to four other uncharged acts:

> On June 1, 2024, at approximately 10:15 p.m., I knowingly, intentionally, and maliciously lit a fire in the grass near the East Asian Library on the campus of the University of California, Berkeley.
>
> On June 11, 2024, at approximately 5:30 a.m., I arrived at the 12th Street side of the Ronald V. Dellums Federal Building and United States Courthouse in Oakland, California, in the Northem District

of California, which is owned by the United States and managed by the General Services Administration. I was carrying a bag containing three Molotov cocktails, each of which is an explosive under federal law. I initially threw rocks at the building, hoping to break a window so I could throw lit Molotov cocktails inside. However, as I was throwing rocks at the building, I was interrupted by two Protective Services Officers. As I ran from the officers, I placed the bag in a planter on the 12th Street side of the building and lit the Molotov cocktails on fire. When I was throwing rocks at the building, I damaged the window of an office that I understand was occupied by the United States Railroad Retirement Board, an independent agency in the Executive Branch of the United States. I understand that window was replaced at a total cost of $4,421.00. I agree that the Ronald V. Dellums Federal Building and United States Courthouse is a “state or government facility” within the meaning of 18 U.S.C. § 2332f(e)(3). My attempt to firebomb the Oakland courthouse was calculated to influence and affect the conduct of government by intimidation and coercion and to retaliate against government conduct. Specifically, I took this action in retaliation for federal law enforcement’s clearing of Pro-Palestine protestors at the Phillip Burton Federal Building and United States Courthouse in San Francisco the previous day and in retaliation for the federal government’s policy with respect to Israel and Palestine.

. . .

On June 13, 2024, at approximately 4:07 a.m., I knowingly, intentionally, and maliciously lit a fire outside of Koshland Hall on the campus of the University of California, Berkeley. I took this action to retaliate against government conduct—specifically, against the government of the State of California’s actions against student protestors.

. . .

On June 16, 2024, at approximately 1:34 p.m., I knowingly, intentionally, and maliciously set a fire outside of a construction site near the Dwinelle Annex on the campus of the University of California, Berkeley. I lit this fire to retaliate against the government of the State of California for the University of California’s support of the State of Israel, for the University of California’s treatment of student protesters, and for the University of California’s decision to begin construction in the area known as “People’s Park” in Berkeley.

Dkt. 25 at 3-4. The plea agreement devoted significantly more space, *i.e.* more lines of text, to describing the June 11 attack on the Oakland "Federal Building and United States Courthouse" than to any of the other incidents, including the June 1 police car firebombing.

From July 2024 until Mr. Goonan signed the plea agreement in early December 2024, Mr. Goonan's attorneys discussed the topic of recusal or change of venue with him about three times, during video visits while Mr. Goonan was incarcerated at Santa Rita Jail. *See* Ex. A at ¶¶ 3-4. Each time, the discussion lasted no more than about three minutes, as the topic would come up as peripheral to conversations they were having about other issues. *See id.* ¶ 3. Attorneys Potter and Wozniak expressed to Mr. Goonan their fears that he would be moved to a more conservative district if they were to move to recuse or change venue. *See id.* ¶ 5. They also told him that he could be moved to another state, and that he would not want that because it would mean he would be moved further away from his loved ones and lose in-person visits. *See id.* The last time they discussed the topic was before Mr. Goonan signed the plea agreement, when they were having discussions regarding the plea offer. *See id.* ¶ 6. Mr. Goonan's recollection is that either Attorney Potter or Attorney Wozniak told him that they had gotten word that the Oakland courthouse venue was not going to be an issue. *See id.* Mr. Goonan's understanding was that his attorneys had received some kind of confirmation from either the prosecutor or the Court that the venue would not be a factor in his sentencing. *See id.* Accordingly, he went along with his attorneys' decision to keep Judge White and not move for recusal or for a change of venue. *See id.* ¶ 11. After he signed the plea agreement, his attorneys never again raised or discussed the topic of recusal or change of venue with him. *See id.* ¶ 9.

On January 14, 2025, Mr. Goonan appeared before Judge White for the first time, and entered a guilty plea pursuant to the plea agreement. *See* Dkt. 24. The conflict/recusal issue was

not raised by either party nor the Court. *See* January 14, 2025 Transcript of Proceedings, attached hereto as Exhibit G.

On January 21, 2025, Attorney Potter sent an email to Mr. Goonan's mother, stating in part: "Regarding the terrorism enhancement, it's a bit complicated, but in all federal cases the federal sentencing guidelines are consulted. In Casey's case, the guideline range based on the offense plus Casey's criminal history resulted in an advisory sentence that was below the mandatory minimum sentence of 5 years. The government felt that since Casey was actually admitting to 5 separate arson incidents, the guideline range without the terrorism enhancement was not actually reflective of Casey's culpability. The local prosecutors are also under pressure from DOJ in Washington D.C. to seek the terrorism enhancement in this case. I assume that is due in large part to the incident involving the federal building." January 21, 2025 Email from Sarah Potter to Julie Goonan, attached hereto as Exhibit H, at 1.

On September 9, 2025, U.S. Probation Officer Pepper Friesen filed the Presentence Investigation Report ("PSR") for Mr. Goonan, recommending a variance sentence of 180 months (15 years) in custody and 15 years of supervised release. *See* Dkt. 54.

On September 16, 2025, the government filed its Sentencing Memorandum and, in accordance with the plea agreement, requested a sentence of 188 months (15 years and 8 months) in custody and 15 years of supervised release. *See* Dkt. 60.

On September 18, 2025, Attorney Potter filed Mr. Goonan's Sentencing Memorandum, requesting a sentence of no more than 96 months (8 years) in custody. *See* Dkt. 65.

On September 23, 2025, Mr. Goonan appeared in court for his sentencing hearing. AUSA Bhagat described in chronological order the five acts Mr. Goonan had pled guilty or admitted to. *See* September 23, 2025 Transcript of Proceedings, attached hereto as Exhibit I, at 4:23–8:1.

Like the plea agreement, AUSA Bhagat's sentencing argument focused more on the June 11 Oakland federal building incident than on any of the other incidents:

> Ten days later – this is June 11th. Ten days go by. Nothing happens. June 11th, he comes to this building. He brings his own rocks – his own very, very large heavy rocks; and he throws them at the window repeatedly to try to break it for the specific purpose to try to break the window so that he can toss lit Molotov cocktails inside the building. And he is interrupted by the protective security officers here – who in this case played a really heroic role – but even as he is running away from the PSOs, Your Honor, he takes the time to stop; put the Molotov cocktails down, light them in a planter that abuts this building before running away.
>
> And as soon as the Defendant flees, you see one of the PSOs in the surveillance video go and actually try to stomp out and put out the fire by stomping on the bag having no idea, of course, that the bag contained Molotov cocktails.
>
> So, we talk about the potential harm with the Oakland federal building incident to people who could have been harmed who were inside the building; but if you actually think about the other aspect of this, the PSO himself could have suffered grave, grave injury if that Molotov cocktail had exploded. Molotov cocktails inherently are unstable. They are things that could go off at any time.
>
> Three hours later after that, he posts about the attack. He talks about it being in retaliation for the breaking up of the encampments at 450 Golden Gate Avenue the day before. And that wasn't something that Mr. Goonan made up. There were encampments the day before at San Francisco Federal building, and the Federal Protective Service did break them up.
>
> So I think that – again, when the Court is thinking about rationality in this, that shows rationality. That shows preplanning.

*Id.* at 5:22–7:2. Arguing that Mr. Goonan's "own writings suggest that he means [certain] words to mean violent action," AUSA Bhagat again referenced the Oakland federal building incident:

> Resistance, in a letter that's as described in paragraph 27 of the PSR, he is taking responsibility for the Oakland Federal building attack and saying that it's in unity with the global access [sic] of resistance.

*Id.* at 12:6-20. AUSA Bhagat spent over 30 lines of the sentencing transcript discussing the June 11 Oakland federal building attack; while only 13 lines of the sentencing transcript are devoted to discussing the June 1 police car firebombing for which Mr. Goonan was convicted, and much fewer for the remaining three acts Mr. Goonan admitted to.

Attorney Potter did not address the government's statements regarding the June 11 Oakland federal building incident, nor any of the other incidents, only stating that "[w]hat [Mr. Goonan] did was awful. He recognizes that it was awful. And he takes responsibility for that. He pled guilty very quickly in this case to take responsibility for his actions." *Id.* at 14:20-23.

After the parties presented their sentencing arguments, Judge White spoke before imposing sentence, stating in part:

> The other side of the ledger is the nature and characteristics of the offense – offenses – offense here. And I have to say that in over 20 years on the bench, this is one of the most serious series of crimes that I have seen. It is an assault on our – attempted assault on our educational institutions, ***on this very court – this very courthouse.*** They were callous. They were – they could have resulted – as Government Counsel argues and is correct – the maiming of some of our federal officers and other bystanders. In his fleeing, it could have resulted in firearms being used by authorities. It's extremely dangerous actions on the Defendant's part.
>
> And I also look at how many criminal actions were shown by the record, how many, if you will, bad acts. In this case there are multiple bad acts on multiple occasions, cowardly acts that this Defendant committed without – with reckless disregard for life or property.
>
> . . .
>
> And the reference in the writings to that terrible event on October 7th in the Middle East maybe bespeaks the depth of venality and anger that this Defendant evidenced.
>
> When I look at the purposes of sentence, there are a few here. One is, which is not always the case or often the case – the Government argues it frequently and it's certainly in the writings of penologists

> – a very important one, which is general deterrence. I'm not one who necessarily believes that with most garden variety crimes, that people in the community are deterred by a sentence.
>
> But in this case where this Defendant has chosen to broadly publicize his writings, his hatred of society and the community, I believe that a significant sentence will hopefully send a message to the community that acts of domestic terrorism are not to be tolerated in any court and not certainly in this court.

*Id.* at 20:19–22:11 (emphasis added).

Judge White imposed a prison sentence of 235 months (19 years and 7 months) and 15 years of supervised release. *See id.* at 23:2-10. Judge White's sentence was nearly 5 years longer than the U.S. Probation Office's recommended sentence, and nearly 4 years longer than the government's requested sentence.

The Judgment was entered on September 26, 2025.[3] *See* Dkt. 74. Mr. Goonan did not file a Notice of Appeal. He has not previously filed any other motion, petition, or application concerning this judgment of conviction in any court.

Mr. Goonan is in the custody of the Bureau of Prisons, at FCI Allenwood Medium, in White Deer, Pennsylvania, serving the sentence imposed in this case. His projected release date is April 14, 2041.

---

[3] This motion is timely pursuant to 28 U.S.C. § 2255(f)(1), which provides that this motion is due one year from "the date on which the judgment of conviction becomes final." Mr. Goonan's judgment of conviction became final on October 10, 2025—14 days after the judgment was entered on September 26, 2025—pursuant to Rule 4(b)(1)(A)(i) of the Federal Rules of Appellate Procedure. One year from October 10, 2025 is October 10, 2026, which was a Saturday, and Monday, October 12, 2026, was a legal holiday. *See* https://cand.uscourts.gov/about-court/locations-hours/court-holidays (listing October 12, 2026, as a court holiday). Accordingly, pursuant to Rule 45(a)(1)(C) of the Federal Rules of Criminal Procedure, as well as Rule 6(a)(1)(C) of the Federal Rules of Civil Procedure, the deadline for filing this motion is today, Tuesday, October 13, 2026.

**28 U.S.C. 2255**

28 U.S.C. § 2255 provides the procedural vehicle for a prisoner in custody under sentence of a federal court to challenge a sentence that is imposed in violation of the Constitution or laws of the United States or that is otherwise subject to collateral attack. Congress intended that "the statute would serve as the primary method of collateral attack on a federally imposed sentence." *United States v. Jordan*, 915 F.2d 622, 629 (11th Cir. 1990). It provides a remedy that is "exactly commensurate" with that provided by habeas corpus, *Hill v. United States*, 368 U.S. 424, 427 (1962); its underlying purpose "is to remove the possibility of the survival of an injustice beyond trial and appeal," *United States v. Lewis*, 392 F.2d 440, 443-44 (4th Cir. 1968). A motion under Section 2255, "like a petition for a writ of habeas corpus, is not a proceeding in the original criminal prosecution but an independent civil suit." *Heflin v. United States*, 358 U.S. 415, 418 n.7 (1959) (citation omitted). It must be addressed in a "plenary, not summary, fashion." *Brown v. United States*, 583 F.Supp.2d 1330, 1335 (S.D. Ga. 2008). "When a district court reviews a Section 2255 habeas motion, '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.'" *United States v. Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011) (quoting Section 2255(b)).

"Claims of ineffective assistance of counsel can be raised for the first time on a section 2255 motion," *United States v. Span*, 75 F.3d 1383, 1387 (9th Cir. 1996), and "are more properly raised" in this manner than by direct appeal, *United States v. Robinson*, 967 F.2d 287, 290 (9th Cir. 1992) (citation omitted).

## ARGUMENT

Counsel for Mr. Goonan provided ineffective assistance in the trial court proceedings, and Mr. Goonan was prejudiced by counsel's actions and failings. Counsel's ineffective assistance included, individually and cumulatively, the following:

- Counsel failed to move for disqualification of all judges in the Oakland federal courthouse in violation of Mr. Goonan's Due Process rights under the United States Constitution as well as 28 U.S.C. § 455.

- Counsel failed to ensure that Mr. Goonan's consent to proceeding with a potentially biased judge was unequivocal, knowing, intelligent, and voluntary; and that this waiver was personally made by Mr. Goonan in court on the record.

    - Counsel failed to explain to Mr. Goonan the importance of his constitutional right to an impartial judge. They did not tell him that the law recognized that Judge White could have a bias against him without being aware of it, or that unconscious bias could be a reason to disqualify him or any other judge in the Oakland federal courthouse.

    - Counsel failed to explain to Mr. Goonan that case law supports that a biased judge may not exercise discretion in sentencing, but may only impose a stipulated/agreed-to sentence between the parties.

- Counsel erred in allowing Judge White to exercise unchecked discretion in sentencing Mr. Goonan, and in failing to object when Judge White expressed impermissible bias toward Mr. Goonan at his sentencing—a bias which led Judge White to inadequately consider the 18 U.S.C. § 3553(a) sentencing factors and impose an excessive sentence nearly five years above the Probation Office's recommended sentence, and nearly four years above the government's recommended sentence.

By virtue of defense counsel's failures, Mr. Goonan was denied effective assistance of counsel and a fair sentencing. Although "strategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable," *Strickland v. Washington*, 466 U.S. 668, 690 (1984), "strategy" is not a talisman that insulates ineffective representation from constitutional norms, *see Wiggins v. State,* 539 U.S. 510, 521, 533-34 (2003) (rejecting counsel's argument that their "strategic" conduct was effective assistance because their investigation did not "reflect reasonable professional judgment"). Moreover, the record indicates that Mr. Goonan's defense

counsel did *not* conduct a "thorough investigation of law and facts." "An uninformed strategy is not a reasoned strategy.... It is, in fact, no strategy at all." *Mann v. Ryan,* 774 F.3d 1203, 1218 (9th Cir. 2014) (quoting *Correll v. Ryan,* 539 F.3d 938, 949 (9th Cir. 2008)) (internal quotation marks omitted).

There is no tactical reason for an attorney to gamble on proceeding with a potentially biased judge, especially without conducting a "thorough investigation of law and facts" and fully advising the client of their fundamental Due Process rights to an impartial judge and tribunal. Characterizing counsel's actions as trial strategy does not automatically immunize an attorney's performance from Sixth Amendment challenges. *See Span*, 75 F.3d at 1389. If this was in fact part of the strategy of counsel then it clearly falls below the "objective standard of reasonableness" because it would not be reasonable to expect a trial court to be unbiased toward a defendant when the courthouse building itself—and therefore the judges and other staff in the building—were the victim or intended victim of one of the defendant's crimes.

## I. MR. GOONAN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO ASSERT HIS DUE PROCESS RIGHTS AND MOVE FOR DISQUALIFICATION OF ALL JUDGES IN THE OAKLAND FEDERAL COURTHOUSE

### A. Background Legal Principles

#### 1. Due Process Requires Disqualification of a Judge if Circumstances Objectively Create the Risk of Bias or an Appearance of Bias

The United States Constitution prohibits deprivation of "life, liberty or property without due process of law." U.S. Const. Amend. V. This constitutional right to due process guarantees a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997); *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.

*In re Murchison*, 349 U.S. 133, 136 (1955).

In describing what constitutes an unconstitutional "interest in the outcome," the Supreme Court has stated that "'every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.'" *Id.*, *quoting Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

Due process requires recusal of a judge when there is an unconstitutional "probability" or "potential" for bias. *Caperton*, 556 U.S. at 2265; *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam); *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). When inquiring into the probability of bias, the Supreme Court applies "an objective standard to protect the parties' basic right to a fair trial and a fair tribunal." *Caperton*, 556 U.S. at 2266. In other words, due process requires recusal "when, objectively speaking 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo*, 580 U.S. at 287, *quoting Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see also Caperton*, 556 U.S. at 872; *Williams*, 579 U.S. at 8.

The "risk of unfairness has no mechanical or static definition. It 'cannot be defined with precision' because '[c]ircumstances and relationships must be considered.'" *Hurles v. Ryan*, 752 F.3d 768, 789 (9th Cir. 2014), *quoting Murchison*, 349 U.S. at 136. The Due Process clause "'establishes a constitutional floor not a uniform standard,' for a judicial bias claim." *Hurles*, 752 F.3d at 788, *quoting Bracy*, 520 U.S. at 904. "If it is a close case, the balance tips in favor of

recusal." *United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008), *citing United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).

This inquiry does not hinge on "whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.'" *Williams*, 579 U.S. at 8, *quoting Caperton*, 556 U.S. at 881. The objective analysis "avoids having to determine whether actual bias is present." *Id.* The Supreme Court has recognized that this "stringent rule may sometimes bar trial judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Murchison*, 349 U.S. at 136; *see also Rippo*, 580 U.S. at 287, *quoting Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986) ("the Due Process Clause may sometimes demand recusal even when a judge 'ha[s] no actual bias'").

Yet, the Supreme Court has found that this stringent rule is necessary to avoid both bias and the appearance of bias.

The objective test derives from a fundamental and indisputable truth about human nature. As the highest court has put it, "[b]ias is easy to attribute to others and difficult to discern in oneself." *Williams*, 579 U.S. at 8. Try as one might, "it is difficult if not impossible for a judge to free himself from the influence" of personal interests, knowledge, or impressions obtained outside the trial courtroom. *Murchison*, 349 U.S. 133, 138 (1955); *Williams*, 579 U.S. at 9 ("a serious question arises as to whether the judge, even with the most diligent effort, could set aside any personal interest in the outcome" and not be unconsciously swayed by such interest). Consequently, a standard which relies on a judge to subjectively identify and acknowledge his or her own bias would not adequately ensure the absence of bias. *Caperton*, 556 U.S. at 883. The due process analysis focuses on "whether, 'under a realistic appraisal of psychological

tendencies and human weakness,' the [judge's] interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id.* at 883-84, *quoting Withrow*, 421 U.S. at 47.

As a practical matter, an objective standard is necessary to provide "an enforceable and workable framework" for determining whether due process requires recusal. *Williams*, 579 U.S. at 8. "The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real motives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one the law can easily superintend or review . . . ." *Caperton*, 556 U.S. at 883.

The Supreme Court has also recognized that "to perform its function in the best way 'justice must satisfy the appearance of justice.'" *Murchison*, 349 U.S. at 136, *quoting Offcutt v. United States*, 348 U.S. 11, 14 (1954). This "appearance" of justice is an integral part of the due process "fairness" guarantee. Because the notion of an impartial judge is so central to the administration of justice and the public's perception of justice, "our system of law has always endeavored to prevent even the probability of unfairness." *Murchison*, 349 U.S. at 136; *see also Williams*, 579 U.S. at 15-16 ("An insistence on the appearance of neutrality is . . . an essential means of ensuring the reality of a fair adjudication.") Accordingly, due process requires recusal when the risk of bias is enough to call into question either the reality or appearance of impartiality.

### 2. A Due Process Violation of the Right to a Fair Tribunal is Structural Error

In *Williams v. Pennsylvania*, the Supreme Court held that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal

involvement as a prosecutor in a critical decision regarding the defendant's case." 579 U.S. at 8. In *Williams*, one of the judges presiding over the defendant's state appeal had previously served as the head of a large district attorney's office and, while serving this role, had approved the capital-punishment charge against the defendant. *Id.* at 4. Almost thirty years later, the case came before the judge on appeal and he refused to recuse himself. The Supreme Court determined that although the judge's role in the case as a prosecutor was limited in scope, it was nonetheless "significant" and "personal" and created an unconstitutional risk of actual bias requiring his recusal. *Id.* at 10-11.

The Supreme Court then turned to the question of whether Williams was entitled to relief, and "whether a due process violation arising from a jurist's failure to recuse amounts to harmless error if the jurist is on a multimember court and the jurist's vote was not decisive." *Id.* at 14. The Supreme Court found that such a defect was a "structural error" and "not amenable to harmless-error review, regardless of whether the judge's vote was dispositive." *Id.* (internal quotation omitted). The Court explained:

> An insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication. Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself. When the objective risk of actual bias on the part of a judge rises to an unconstitutional level, the failure to recuse cannot be deemed harmless.

*Id.* at 15-16.

The holding in *Williams* should come as no surprise; the Court rightfully regards judicial neutrality as the foundation of a fair trial. "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it 'affect[s] the

framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver v. Massachusetts*, 582 U.S. 286, 294-95 (2017), *quoting Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Structural errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Fulminante*, 499 U.S. at 310, *quoting Rose v. Clark*, 478 U.S. 570, 577-78 (1986). Thus, structural errors are subject to automatic reversal. *See Neder v. United States*, 527 U.S. 1, 7-8 (1999) (recognizing that structural errors arise in a very limited number of cases but "are so intrinsically harmful as to require automatic reversal").

The Court previously had stated that a violation of a defendant's right to be tried by an impartial adjudicator is structural error, because the error deprives the defendant of the "basic protections" guaranteed by the Due Process Clause, "infect[s] the entire trial process" and renders the "trial fundamentally unfair." *Neder*, 527 U.S. at 8-9 (internal quotations omitted); *see also Rose*, 478 U.S. at 577-78 (recognizing that a denial of the right to counsel and right to an impartial adjudicator would amount to structural error).

In *United States v. Becerra*, 939 F.3d 995 (9th Cir. 2019), the Court summarized two other grounds for categorizing an error as structural, and both are applicable to the situation of an implicitly biased jurist. "[E]rrors have been found structural where the effect of those errors are 'necessarily unquantifiable and indeterminate,'" making a harmless error analysis impossible. *Id.* at 1004, *quoting Neder*, 527 U.S. at 11. As discussed above, bias is determined objectively for the very reason that a judge may not be able to discern actual bias within. For the same reason, it would be impossible to assess and quantify how a conflicted judge might have affected the outcome. Also, "certain errors have been considered structural where the 'right at issue is not

designed to protect the defendant from erroneous conviction but instead protects some other interest.'" *Becerra*, 939 F.3d at 1004, *citing Weaver*, 478 U.S. at 295. In addition to protecting the defendant from erroneous conviction, the right to an impartial judge is essential "to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams*, 579 U.S. at 16.

### 3. The Judicial Disqualification Statute, 28 U.S.C. § 455, Requires Recusal Under the Same Objective Standard as the Due Process Analysis

The federal judiciary is subject to the statutory disqualification provisions found under 28 U.S.C. § 455 and the Code of Conduct for United States Judges, Guide to Judiciary Policy, Vol. 2, Pt. A.[4] Claims of judicial bias in federal criminal cases generally are raised under Section 455 which is rooted in due process concerns. The statute is the procedural means for executing the constitutional requirement. The standard for recusal under Section 455 is substantially similar to the due process standard discussed in the aforementioned cases, therefore, the cases analyzing recusal decisions expressly under Section 455 are instructive in the due process analysis.

28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." As with the due process test, Section 455(a) aims to eliminate not only actual bias but also the appearance of impropriety in the federal judiciary. *See Liljeberg v. Health Serv.*

---

[4] (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

> (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . .

*Code of Conduct for United States Judges*, Canon 3, § C.

*Acquisition Corp.*, 486 U.S. 847, 860 (1988). Section 455(a) was enacted "to promote public confidence in the integrity of the judicial process" by requiring an objective test for determining judicial bias. *Id.* at 859 n.7 (citing S. Rep. No. 93-419, at 5; H. R. Rep. No. 93-1453, at 5). In *Liljeberg*, the Supreme Court considered whether Section 455(a) required disqualification of a judge "based on an appearance of partiality, even though the judge was not conscious of the circumstances creating the appearance of impropriety . . . ." 486 U.S. at 858. The Supreme Court determined that the Section 455(a) inquiry "does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Id.* at 859-60. Thus, recusal is required under Section 455(a) when the facts and circumstances would "reasonably cause an objective observer to question [the judge's] impartiality." *Id.* at 865-67; *see also Preston v. United States*, 923 F.2d 731 (9th Cir. 1991) (in federal tort action, judge was required to recuse himself under Section 455(a) because he previously had worked for law firm that represented nonparty corporation at risk of an indemnification claim from the government stemming from the litigation).

In *Holland*, the Ninth Circuit added that "[t]he reasonable third-person observer is not a 'partly informed man-in-the-street,' but rather someone who understand[s] all the relevant facts' and has examined the record and law." *Holland*, 519 F.3d at 913-14, *quoting LoCascio v. United States*, 473 F.3d 493, 496 (2d Cir. 2007). By requiring the *sua sponte* recusal of a federal judge when a reasonable observer might question his or her impartiality, *see Holland*, 519 F.3d at 912, the provisions of Section 455 effectively ensure the due process right of a neutral judge in federal proceedings.

**4. Courts Consistently Have Held That Disqualification Is Required When Judges and Judicial Staff are Victims or Intended Victims of the Alleged Crime**

The federal reporters are not overflowing with appellate decisions involving judges failing to recuse themselves from cases in which they are alleged to be the victim of the crime, presumably because such a scenario presents an obvious ground for disqualification. The few cases that exist deal with less direct situations, such as when the judge is not specifically the intended target, when the offense is an inchoate crime, or when the offense targets the staff or family of the judge. These cases make clear that these sorts of less direct connections to the charged offense require disqualification.

In *Rodriguez v. Copenhaver*, 823 F.3d 1238 (9th Cir. 2016), the defendant, Rodriguez, was charged with various offenses including assault of a federal judge. Because the victim was a district court judge in the Southern District of Florida where Rodriguez was charged, the acting Chief District Judge issued an order recusing all of the judges from that district. A judge from a different district was appointed, and a jury ultimately acquitted Rodriguez of the assault but convicted him of firearm offenses. *See id.* Subsequently, the Bureau of Prisons (BOP) wrote a letter to the Southern District of Florida, soliciting the court's recommendation as to whether to grant Rodriguez's request for a *nunc pro tunc* designation to a state facility, which would have had the effect of giving Rodriguez more credit for time served on a state sentence. A recused judge of the Southern District of Florida responded with a strong recommendation that Rodriguez's request be denied. The judge asserted that it would be an "insult" to the court to allow a defendant who had attacked a federal judge to receive in effect a partially concurrent sentence. *Id.* at 1241. The BOP adopted the judge's recommendation and denied Rodriguez credit for the time he served in state custody.

Rodriguez challenged that denial in a habeas petition under 28 U.S.C. § 2241. On the appeal of the dismissal of that petition, the Ninth Circuit found that "the Bureau of Prisons acted

contrary to 18 U.S.C. § 3621(b)(4) and due process" by relying on a recommendation from a judge who did not impose the sentence, contrary to § 3621(b)(4), and "who had been formally recused from the case due to an actual conflict – namely, his connection to the victim of the crime." *Id.* at 1240. The Ninth Circuit concluded that adopting the recused judge's recommendation did "not satisfy the appearance of justice" or "afford Rodriguez his due process right to neutral adjudication." *Id.* at 1243. Thus, "as a matter of both statute and due process," the Ninth Circuit found that the BOP was not permitted to consider the letter from the recused judge. *Id.*

In *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995), Nichols was an accomplice to the Oklahoma City bombing that targeted a federal building one block away from the federal district court courthouse, shattering the windows of the judge's courtroom and chambers. *Id.* at 349. The blast "slightly injured" a member of the judge's staff and it was "likely that other court personnel and two judges would have been severely injured had they been at their desks." *Id.* at 349-350. After the district court judge denied his recusal motion, Nichols sought mandamus relief from the Tenth Circuit.

Nichols had to prove that the district court judge's refusal to recuse himself under 28 U.S.C. § 455(a) was "a clear abuse of discretion" or conduct "amounting to a usurpation of judicial authority." *Id.* Because he brought a mandamus proceeding, he also had to show a "clear and indisputable right to relief." *Id.* at 350. The Tenth Circuit concluded that Nichols had satisfied these demanding standards. *Id.* at 352. Acknowledging the judge likely was not subjectively biased, the Court applied the objective standard required under § 455(a) – whether a "reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Id.* at 352, *quoting United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). The

Court held that under the circumstances, the district judge had abused his discretion in failing to recuse himself because "a reasonable person could not help but harbor doubts about [the judge's] impartiality." *Id.* The Court added:

> As the Fifth Circuit concluded in [*United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995),] "[p]ublic respect for the judiciary demands this result." 49 F.3d at 157. The effect of our decision today may, indeed, be to "bar trial by [a] judge[] who ha[s] no actual bias and who would do [his] very best to weigh the scales of justice equally between contending parties. But to perfect its high function in the best way justice must satisfy the appearance of justice." *Id.* (quotation omitted). In reaching this result, we have considered the totality of the circumstances and looked to the future of this case. *United States v. Ritter*, 540 F.2d 459, 464 (10th Cir.), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976). We have also balanced the possible questioning of impartiality by a reasonable person against the relative ease of replacing Judge Alley with an available judge from a very large pool of judges outside the State of Oklahoma.

*Nichols*, 71 F.3d at 352.

The same conclusion was reached by the Seventh Circuit in *In re Nettles*, 394 F.3d 1001 (7th Cir. 2005), which involved an unsuccessful plot to destroy a federal courthouse. Nettles told a jailhouse snitch of his desire to destroy the courthouse using a truck bomb, prompting an FBI sting operation in which undercover agents offered to supply the explosive materials to Nettles and help him detonate it. Nettles was charged with attempting to damage the courthouse. *Id.* at 1002.

A judge from that court was assigned to the case, and Nettles moved to recuse her along with all other judges of that court "on the ground that since the plot involved a threat to the judges' safety, a trial presided over by any one of them would create an appearance of bias." *Id.* at 1002. The judge denied the motion "on the ground there had never been 'any real danger' of damage to the building and she had no 'actual fear of harm' that might influence her rulings in

the case." *Id.* Nettles filed a petition for mandamus seeking the recusal of the judges in that district because "a reasonable observer would think there was a significant risk that the judge will resolve the case on a basis other than the merits." *Id., quoting Hook v. McDade*, 89 F.3d 350, 354 (7th Cir. 1996).

While acknowledging that "the actual threat" posed to the courthouse "was nil because Nettles' accomplices were federal agents," the Seventh Circuit determined that it would be reasonable to fear that "the next time he might be more careful and succeed in his aim." *Id.* at 1003. Furthermore, the Court reasoned:

> A reasonable observer would think that a judge who works in [the targeted courthouse] would want Nettles to be convicted and given a long sentence, rather than to be set free, either forthwith or sooner rather than later, to make another attempt to destroy the courthouse or its occupants. It is true that if Nettles is innocent, and therefore not a threat, the judge's incentive to convict him would be eliminated or at least attenuated. But (it might appear to the reasonable, but outside observer of the judicial system) a judge might be convinced of Nettles' guilt yet concerned that a jury might acquit him, and might therefore rule against him on evidentiary and procedural issues, regardless of the merits. And innocence is not the only question in a criminal trial; the length of the sentence is another, and it is a question on which the judge retained significant discretion under the federal sentencing guidelines even before *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

*Nettles*, 394 F.3d at 1003.

Based on the appearance of bias and not whether the judge "would in fact be prejudiced against Nettles," the Seventh Circuit held that Nettles was entitled to the recusal of the district court judges as well as the judges of the Seventh Circuit Court of Appeals, all of whom worked in the targeted courthouse. *Id.*

In contrast, in *Holland*, recusal was not required where Holland "obtained the judge's home telephone number and left at least one threatening message prior to his sentencing." 519

F.3d at 910-11. *Holland* addressed a situation distinguishable from the foregoing cases and the present case, in that the defendant's behavior giving rise to a potential conflict occurred after the prosecution was initiated. At sentencing, the district court judge said that Holland's message "could be construed as threatening," but the judge determined that the threats were an attempt by the defendant to manipulate the court system and, therefore, chose not to recuse himself. *Id.* at 911. The Ninth Circuit affirmed, holding that the trial court's suspicion about Holland's motive, as well as all other circumstances surrounding the threat, justified the trial court's decision not to disqualify himself under Section 455. *See id.* at 911; 916-17.

As the Court observed in *Nettles*, cases involving "the issue of recusal based on threats have held that a threat to a judge that appears to be genuine and not just motivated by a desire to recuse the judge requires recusal." 394 F.3d at 1002. But threats to a judge's family, staff, and colleagues on the bench equally raise concerns of partiality. The judge in *Nichols* was not personally injured or targeted and "lost no family or friends in the bombing" carried out by Nichols. 71 F. 3d at 350. Yet the Tenth Circuit found that "a reasonable person could not help but harbor doubts about the impartiality" of the judge when considering that the bombing damaged his courtroom and chambers, slightly injured a member of his staff, and injured other court personnel. *Id.* In *Nettles*, no one was injured or at risk of being injured by Nettles's attempt to bomb the federal courthouse because his accomplices were federal agents and the plot was a sham. Yet, because the threat posed by Nettles was genuine, the Seventh Circuit found that a reasonable observer would objectively expect those targeted by Nettles's bombing to harbor certain fears and concerns about him. And in *Rodriguez*, recusal was required not only of the judge who was the direct victim of defendant's assault, but also his judicial colleagues.

These cases demonstrate that when a judge, a member of a judge's family, or a member of a judge's staff has a direct, personal, and extrajudicial connection to a violent crime or attempted crime, objectively, he or she cannot serve as a neutral judge in the prosecution of the person accused of that crime.

**B. The Ineffective Assistance**

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984), in which the Court held that a defendant claiming ineffective assistance of counsel must show that (1) counsel's performance was "deficient," that is, "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) the "deficient performance prejudiced the defense," that is, "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Strickland*, 455 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

With respect to the "performance" prong, the Court elaborated, "the defendant must show that counsel's representation fell below an objective standard of reasonableness. . . . The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The court must "eliminate the distorting effects of hindsight" and instead, "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. However, in making the determination whether counsel's "acts or omissions were outside the wide range of professionally competent assistance, . . . the court should keep in mind that counsel's function, as elaborated in prevailing professional

norms, *is to make the adversarial testing process work* in the particular case." *Id.* at 690 (emphasis added).

Mr. Goonan's claims of ineffective assistance of trial counsel are fairly limited in number and type. They all relate to the concern for impartiality and decisions surrounding who would adjudicate and decide the defendant's ultimate fate. But as the Supreme Court has correctly recognized, even a single, serious error can support a claim of ineffective assistance of counsel. *See Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986), *citing United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984) ("[T]he type of breakdown in the adversarial process that implicates the Sixth Amendment is not limited to counsel's performance as a whole—specific errors and omissions may be the focus of a claim of ineffective assistance as well.").

Moreover, although limited in number and type, the claims relating to judicial impartiality are not limited in significance. Rather, these issues lie at the heart of Mr. Goonan's core claim that he was denied his fundamental right to a fair trial, which includes a fair sentencing. *See Fulminante*, 499 U.S. at 310. Counsel's errors with respect to judicial disqualification served to undermine the effectiveness of other aspects of their representation. It is in this sense that counsel's conduct fell below the standard of care established by *Strickland*; by allowing what the government and Court viewed as the defendant's victims—the staff, including the judges as well as the security officers, of the courthouse building Mr. Goonan admitted to attacking—to participate in his sentencing, Mr. Goonan's attorneys failed to "make the adversarial testing process work."

On the issue of Judge White's involvement, defense counsel chose not to move to disqualify him or for change of venue because they feared that Mr. Goonan would be moved to a more conservative district if they did so, or even to another state. *See* Ex. A at ¶ 5. They believed

it was less risky to gamble that Judge White would not be swayed by emotion and that he would be fair to the defendant at sentencing.

But the decision to stick with Judge White was unreasonable because this case introduced a personal element that counsel could not reasonably assume would have no negative impact on Judge White's impartiality. As previously discussed, as a matter of human nature, and indeed, *as a matter of law*, judicial bias may be unconscious and it may arise despite the judge's best efforts to resist it. The Supreme Court and appellate courts have recognized that the risk of actual bias arising from a conflict of this nature is so high that Due Process demands recusal. Categorically, it was unreasonable for counsel to believe that Judge White was immune to this risk.

With respect to the "prejudice" component of a claim of ineffective assistance of counsel, to establish this prong a defendant needs only to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the case. *Strickland*, 455 U.S. at 694. Prejudice is clearly established here, as discussed further in Section III *infra*. Immediately after making impassioned statements of impermissible bias against Mr. Goonan, Judge White imposed a sentence that was nearly the statutory maximum and clearly excessive based on the record and the parties' sentencing submissions and arguments at sentencing. It is significant that the Court here differed from the evaluation of both the Probation Office and the government regarding what sentence would be sufficient to satisfy the goals of Section 3553; and then specifically relied upon the fact that one of the crimes was committed "*on this very court – this very courthouse*" in support of its unreasonable sentencing decision. *See, e.g.*, *United States v. Wilmer*, 595 F. App'x 685, 686-87 (9th Cir. 2014) (finding 300-month sentence for sex trafficking of a child "substantively reasonable in light of the 18 U.S.C. §

3553(a) sentencing factors and the totality of the circumstances, including the severity of Wilmer's crimes and his extensive criminal history," and because it "was significantly lower than that recommended by the Guidelines, the government, and the probation officer.").

Moreover, the Court in *Strickland* held that "[i]n certain Sixth Amendment contexts, prejudice is presumed." 455 U.S. at 691. Picking up on that theme, in *Weaver v. Massachusetts*, 582 U.S. 286 (2017), the Court provided some guidance as to how to assess the prejudice component of a claim of ineffective assistance of counsel when the attorney's error leads to what would be considered "structural" error in the context of a direct appeal. The type of structural error at issue in *Weaver*—a violation of the constitutional provision requiring public court proceedings—was held not to relieve a defendant of the prejudice prong in a claim of ineffective assistance of counsel. However, the Court assumed, without deciding, that an attorney's error that creates a different type of structural error affecting the fundamental fairness of the trial would not require the defendant to prove that the error affected the outcome. *Id.* at 300-01. In *Williams*, 579 U.S. at 14-15, and in *Rose*, 478 U.S. at 577, the Court held that a Due Process denial of an impartial judge is such a structural error affecting fundamental fairness. Reading these cases together, it is clear that the Supreme Court would view the prejudice prong of *Strickland* in this instance to be presumptively established. In other words, Mr. Goonan does not have to prove that counsel's failure to recuse Judge White actually affected the outcome. This is the appropriate outcome for all the same reasons that the Court in *Williams* and *Rose* found the error to be structural.

Furthermore, two cases from this Circuit are consistent with what the *Weaver* Court assumed to be the case with respect to structural error affecting fundamental fairness. In *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008), the Court stated that when an attorney's

deficiency results in structural error, "no . . . additional or separate showing of prejudice would appear necessary." In *United States v. Withers*, 638 F.3d 1055, 1067-68 (9th Cir. 2011), the Court cited *Styers* for the same principle. *See also Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) (Under *Strickland*, "whether we require the defendant to show actual prejudice, . . . or whether we instead presume prejudice turns on the magnitude of the deprivation of the right to effective assistance of counsel.").

In the usual case, it would be impossible to review a judge's sentencing decision to assess whether that decision may have been influenced by facts sufficient to support recusal. Here, however, the Court's own words demonstrate that its sentencing decision was infected by personal animus toward Mr. Goonan because one of Mr. Goonan's crimes occurred at the judge's own courthouse. This was structural error and it was presumptively prejudicial.

## II. MR. GOONAN'S COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO ENSURE THAT HIS CONSENT TO A BIASED JUDGE WAS UNEQUIVOCAL, KNOWING, INTELLIGENT, AND VOLUNTARY, AND THAT HIS WAIVER WAS PERSONALLY MADE IN COURT

### A. Background Legal Principles

#### 1. Mr. Goonan Did Not Unequivocally, Knowingly, and Intelligently Waive His Right to an Impartial Judge

As discussed at length above, the nature of the conflict in Mr. Goonan's case was not waivable; the risk and appearance of actual bias was so significant of a due process issue that the judge was required to disqualify himself. *See* 28 U.S.C. § 455(e) (describing circumstances of a non-waivable conflict).

Moreover, to the extent the conflict was waivable, Mr. Goonan did not waive it. 28 U.S.C. § 455(e) contemplates that any waiver be given formally after "full disclosure on the record of the basis for disqualification." Even apart from that statute, with respect to the Due

Process problem, a waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). "Presuming waiver from a silent record is impermissible." *Carnley v. Cochran*, 369 U.S. 506, 516 (1962); *Barker v. Wingo*, 407 U.S. 514, 525 (1972) ("Presuming waiver of a fundamental right from inaction is inconsistent with this Court's pronouncements on waiver of constitutional rights."). "[C]ourts indulge every reasonable presumption against waiver" of a fundamental constitutional right. *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937).

Any elements of a valid waiver were completely absent from Mr. Goonan's court proceedings in this case. Judge White never raised the issue, nor did he ever disclose prior to sentencing that he might be biased against Mr. Goonan due to the fact that one of Mr. Goonan's crimes was an attack on the very courthouse Judge White sits in. Judge White did not disclose how others might see this as a problem, and he did not invite Mr. Goonan to consider the implications. Mr. Goonan was not advised about the role of the judge, his duty of neutrality and impartiality, and that his sentencing, if affected by bias, could be very detrimental to Mr. Goonan's liberty. There was no colloquy to ensure Mr. Goonan was making a voluntary decision to proceed with Judge White.

An analogous circumstance is the waiver of the right to counsel, because the potential dangers of waiving the right to an objectively impartial judge are equally significant. In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court held that a defendant has a constitutional

right to proceed without counsel, but only when he or she voluntarily and intelligently elects to do so.

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.

*Faretta*, 422 U.S. at 835 (citation omitted).

In *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004), the Court held that a *Faretta* waiver of representation must not only be knowing and intelligent, it must be unequivocal. In order for a waiver to be valid, the trial court must insure that the defendant understands 1) the nature of the charges against him or her, 2) the possible penalties, and 3) the dangers and disadvantages of self-representation. *See id.* The Court suggested "model language" to ensure that a defendant considering self-representation was aware of all of the potential risks of choosing that path, including having to face the prosecutor's superior skill and the complex rules and procedures that govern all aspects of a trial, from jury selection through closing argument. *Id.* at 1168, *citing United States v. Hayes*, 231 F.3d 1132, 1138-39 (9th Cir. 2000).[5]

---

[5] The suggested model language from *Hayes* reads as follows:

> The court will now tell you about some of the dangers and disadvantages of representing yourself. You will have to abide by the same rules in court as lawyers do. Even if you make mistakes, you will be given no special privileges or benefits, and the judge will not help you. The government is represented by a trained, skilled prosecutor who is experienced in criminal law and court procedures. Unlike the prosecutor you will face in this case, you will be exposed to the dangers and disadvantages of not knowing the complexities of jury selection, what constitutes a permissible opening statement to the jury, what is admissible evidence, what is appropriate direct and cross examination of witnesses, what motions you must make and when to make them during the trial to

While the court need not recite the model language verbatim, the defendant must be adequately warned of the consequences and disadvantages of self-representation with a comparable degree of specificity.

Another apt analogy arises when a defendant seeks to waive conflict-free counsel. In that circumstance, for a waiver to be considered valid, the defendant must be advised of "the risks inherent in multiple representation." *United States v. Partin*, 601 F.2d 1000, 1008 (9th Cir. 1979). Indeed, whenever a defendant waives any fundamental constitutional right—the right to have the government prove its case beyond a reasonable doubt, the right to a jury trial—the court must insure that the defendant fully understands what he or she is giving up and the risks and consequences of surrendering those important rights. Why would it be any different with respect to the right to an objectively impartial judge?

In this case, before proceeding to sentencing, Judge White should have advised Mr. Goonan of his Due Process right to have an impartial judge preside over his case, including his sentencing. Judge White also should have advised Mr. Goonan about the role of the judge in a criminal case and why impartiality is foundational to the American justice system. When Judge White stated that his sentencing decision was influenced by the fact that one of Mr. Goonan's crimes was, as Judge White saw it, an attack on the judge's own courthouse, Judge White should have realized that his impartiality had been impermissibly affected. And, even if Judge White thought he could remain impartial regardless, Judge White should have gone on to say that the real question is whether an outside observer might reasonably question his impartiality. He

---

> permit you to make post-trial motions and protect your rights on appeal, and what constitutes appropriate closing argument to the jury.

*Hayes*, 231 F.3d at 1138–39.

should have told Mr. Goonan that the law recognizes that a well-meaning and conscientious judge may not be aware of a bias that affects the decision-making process, and that his personal involvement as an intended victim in the case unconsciously could affect his impartiality and negatively impact Mr. Goonan's right to a fair sentencing. He should have given Mr. Goonan an opportunity to ask questions about the issue, to consult with his attorneys, and to move to disqualify.

In sum, to the extent that it can be said that Mr. Goonan could have and did "waive" his right to an impartial judge, any such waiver was invalid because he was not informed of the risks and dangers of proceeding with Judge White and did not unequivocally assent to his continued involvement at sentencing.

#### 2. Mr. Goonan Did Not Personally Waive His Basic Right to an Impartial Judge

More fundamentally, Judge White should have made sure that Mr. Goonan personally consented to Judge White continuing on the case. Because the impartiality of the judge is the foundation and predicate for a fair trial, including a fair sentencing, this was not a decision that Mr. Goonan's attorneys could make for him. It was a decision only Mr. Goonan could make. *See New York v. Hill*, 528 U.S. 110, 114 (2000) ("For certain fundamental rights, the defendant must personally make an informed waiver"); *see also United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.").

The Supreme Court implicitly recognized that this circumstance required the defendant's personal consent in *Gonzalez v. United States*, 553 U.S. 242, 251 (2008). The Court held that a lawyer may consent on a client's behalf to a magistrate judge conducting *voir dire* in a criminal

case, but the holding was expressly premised on the defendant's concession that the magistrate judge was "capable of competent and impartial performance." *Id.* (emphasis added). When something as fundamental as the impartiality of the judge is itself at issue, it is for the defendant to decide whether to waive the right after being fully informed of all the dangers and disadvantages of doing so.

In *Hill*, the Court held that a defense attorney's agreement to continue his client's trial validly waived the defendant's right to a speedy disposition of charges under the Interstate Agreement on Detainers ("IAD"), even though the record did not establish the defendant's personal assent to counsel's waiver of the IAD's time limits. 528 U.S. at 111-13. The Court stated that, "What suffices for waiver depends on the nature of the right at issue." *Id.* at 114. "For certain fundamental rights, the defendant must personally make an informed waiver"; "[f]or other rights, however, waiver may be effected by action of counsel." *Id.* "'Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has - and must have - full authority to manage the conduct of the trial.'" *Id.* at 114-15 (*quoting Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988)). The Court concluded that the attorney's agreement to continue his client's trial was by itself sufficient to waive his client's rights under the IAD because "[s]cheduling" a trial is the type of "routine" strategic decision within the province of counsel's discretion. *Hill*, 528 U.S. at 115-18.

Waiver of the right to an objectively impartial judge differs significantly from waiver of the right to a speedy disposition of criminal charges and other such "routine" issues that arise in criminal proceedings. In contrast to a mere "[s]cheduling matter," *Hill*, 528 U.S. at 115, the right to an impartial judge is a weighty one with an impressive constitutional pedigree. Unlike evidentiary matters and routine legal objections made (or forgone) during the course of a trial,

which concern issues of strategy and thus are within the province of defense counsel's discretion, *see Hill*, 528 U.S. at 115, the waiver of the right to an objectively impartial judge is not a mere strategic or tactical matter. *See Florida v. Nixon*, 543 U.S. 175, 187-88 (2004) (stating that "[w]hile a guilty plea may be tactically advantageous for the defendant, . . . the plea is not simply a strategic choice" that can be made solely by defense counsel).

Instead, the right to an impartial judge is one of those "basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client …." *Hill*, 528 U.S. at 114-15 (*quoting Taylor*, 484 U.S. at 417-18). As examples of such "basic rights" requiring a defendant's personal waiver, the Court in *Hill* cited cases concerning the right to counsel, *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), and the right to plead not guilty, *Brookhart v. Janis*, 384 U.S. 1, 7-8 (1966). *See Hill*, 528 U.S. at 114-15. Similarly, in *Taylor*, in addition to citing *Brookhart*, the Court gave examples from other cases of other "basic" rights requiring a defendant's personal waiver: *Doughty v. State*, 470 N.E.2d 69 (Ind. 1984) (right to a jury trial), and *Cross v. United States*, 325 F.2d 629 (D.C. Cir. 1963) (constitutional right to be present during trial). *See Taylor*, 484 U.S. at 417-18 & n.24. The Indiana Supreme Court's decision in *Doughty*, which the Court cited in *Taylor* as an example of the correct procedure for waiving a "basic" right, describes that procedure as follows:

> A waiver of this right [to a jury trial] must be made in a knowing, intelligent, and voluntary manner, with sufficient awareness of the surrounding circumstances and the consequences …. The record must reflect that such a waiver was made, so that the question of an effective waiver can be reviewed even though no objection was made at trial …. The record reflection must be direct and not merely implied. It must show the personal communication of the defendant to the court that he chooses to relinquish the right.

*Doughty*, 470 N.E.2d at 70. *See also Duncan v. Louisiana*, 391 U.S. 145, 158 n.27 (1968) (discussing a defendant's waiver of right to trial by jury and citing *Patton v. United States*, 281

U.S. 276, 312 (1930), which required "the express and intelligent consent of the defendant" for a valid waiver of jury trial to occur).

To this list of basic rights requiring a personal waiver by a defendant should be added the right to a felony indictment by a federal grand jury. *See United States v. Macklin*, 523 F.2d 193, 196 (2d Cir. 1975) ("[T]he waiver of indictment has been deliberately clothed in formal procedure. It must be made in open court and the defendant must be told the nature of the charge and informed of his rights before he is allowed to consent to the waiver."). Finally, in *McCoy v. Louisiana*, 584 U.S. 414 (2018), the Court held that it is for the defendant, not counsel, to choose the broad outline of his defense. The Court held that a capital defendant's Sixth Amendment right to counsel includes the right to insist that counsel refrain from admitting guilt during the guilt-phase of the murder trial even when counsel reasonably believes that admitting guilt is the best way to avoid the death penalty. *Id.* at 417-18.

The fact that the denial of the right to an impartial judge is "structural error," *Williams*, *supra*, supports the conclusion that the right is personal and basic to the defendant. The class of rights the denial of which gives rise to "structural error" are rights that "affect[] the framework within which the [criminal] trial proceeds." *Fulminante*, 499 U.S. at 310. "These are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309-10. The Court gave as an example, the right to an impartial judge, citing *Tumey v. Ohio*, 273 U.S. 510 (1927), as well as the right to counsel. *Fulminante*, 499 U.S. at 309. Indeed, the list of rights the denial of which leads to structural error is remarkably similar to the list of rights the Court has held are "personal" and "basic" and may only be waived by the defendant. The Court's treatment of a right as "structural" and "basic" in the former context should inform its treatment of the right as "personal" and "basic" in the latter.

The Court repeatedly has said that waiver of such fundamental rights, in order to be valid, must constitute the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. at 464; *see also College Savings Bank v. Florida Prepaid Postsecondary Educational Expense Board*, 527 U.S. 666, 682 (1999) (quoting the *Zerbst* formulation as the "classic description" of an effective waiver of a constitutional right). This waiver formulation necessarily implies that, at minimum, the defendant personally must be aware of the relinquishment of the right in question and give his personal assent to its relinquishment.

Finally, these basic rights share something in common: they "must be exercised or waived at a specific time or under clearly identifiable circumstances …." *Barker*, 407 U.S. at 529 (listing, as examples, waivers of "the rights to plead not guilty, to demand a jury trial, to exercise the privilege against self-incrimination, and to have the assistance of counsel.") The Court has "placed the entire responsibility on the prosecution to show the claimed waiver [of such basic rights] was knowingly and voluntarily made." *Ibid.*

Here, the Court did not advise Mr. Goonan of his right to an impartial judge and did not provide him with an opportunity to personally assert or validly waive it. Therefore, from the silent record, Mr. Goonan cannot be deemed to have waived the right to an impartial judge.

**B. The Ineffective Assistance**

Defense counsel plays a critical role in advising a defendant whether to assert or waive a fundamental constitutional right, including the right to have the government prove its case beyond a reasonable doubt, the right to a jury trial, and the right to testify. *See, e.g., United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992) (discussing this role in the context of the defendant's right to testify at trial). Counsel must fully advise the client of all that is at stake at

these important decision points—specifically, both the potential advantages and disadvantages to either waiving or asserting a right that is both basic and personal to the defendant. “[W]hile defense counsel serves as an advocate for the client, it is the client who is the master of his or her own defense.” *Id.* at 1533. The failure to meet that responsibility to ensure a fully informed client is the one making the decision is grounds for a claim of ineffective assistance of counsel. *See id.*; *see also Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (counsel has critical obligation to advise client of the advantages and disadvantages of a plea agreement). As discussed, the waiver of the right to an objectively impartial judge is no less significant than the waiver of the right to trial, the right to a jury deciding the facts, or the right to testify. Indeed, the impartiality of the judge is a necessary condition for the effectuation of all of a defendant’s core constitutional rights that are administered and overseen from the bench. Therefore, to obtain his consent to Judge White presiding over the case, counsel was obligated to fully describe all potential advantages and disadvantages and options and to ensure that the decision was Mr. Goonan’s to make.

In this case, defense counsel discussed the topic of recusal or change of venue with Mr. Goonan for no more than a total of approximately ten minutes, and only in the period before Mr. Goonan signed the plea agreement—long before Mr. Goonan ever appeared in court before Judge White, as his initial hearings were before Magistrate Judge Ryu. *See* Ex. A at ¶¶ 3, 5-6. His attorneys advised him that it was best to proceed in the Oakland federal courthouse with a judge of that court, because they feared that if they moved to recuse or change venue, Mr. Goonan’s case would end up in a more conservative district.[6] *See id.* ¶ 5. They also told Mr.

---

[6] In fact, there was very little practical downside to a change to a more conservative district. The plea agreement capped Mr. Goonan’s exposure at 240 months. The government was recommending a sentence of 188 months. Accordingly, the maximum potential downside to a motion to recuse would have been a sentence only five months longer than Mr. Goonan ended up receiving; and the actual loss from being sentenced by the judge who admitted he considered Mr.

Goonan that he could also be moved to another state if they were to move to recuse or change venue, and that he would not want that because it would mean he would be moved further away from his loved ones and lose his cherished in-person visits. *See id.* Finally, during discussions regarding the plea offer, Mr. Goonan recalls that one of his attorneys, either Attorney Potter or Attorney Wozniak, had told him that they had received some kind of confirmation that the Oakland courthouse venue would not be a factor in his sentencing. *See id.* ¶ 6. It was Mr. Goonan's understanding from that conversation that his attorneys had received such confirmation from either the prosecutor or the Court. *See id.* Mr. Goonan accepted his attorneys' advice and went along with the decision to keep Judge White and not move for recusal or for a change of venue. *See id.* ¶ 10. After he signed the plea agreement, his attorneys never again raised or discussed the topic of recusal or change of venue with him. *See id.* ¶ 8.

Defense counsel should have advised Mr. Goonan of all that Judge White should have stated on the record in court to Mr. Goonan. They should have made sure that Mr. Goonan understood the judge's role and how a biased judge could materially impact his liberty interest, as the judge's bias could play a material factor in the sentence he received. They should have told Mr. Goonan that, whatever their personal opinion of Judge White, a reasonable person might have a different view about his ability to be impartial. They should have told him that Judge White was technically an intended victim of Mr. Goonan's June 11, 2024 firebombing attempt, and therefore, they could not say with certainty whether Judge White would be able to be

---

Goonan's actions "one of the most serious series of crimes that I have seen" because "[i]t is an assault on our – attempted assault … on this very court – this very courthouse," was the 47 months Judge White imposed in excess of the government's recommendation. This substantial, and actual downside from being sentenced by a judge whose impartiality may fairly be questioned overwhelms any theoretical downside from a sentence by an unbiased judge in another district likely to follow the recommendations of the government and Probation.

impartial. They should have told defendant that, because the facts of the case were so personal, targeting the very building in which Judge White presided as a judge for over two decades, that Judge White might hold it against Mr. Goonan at sentencing without being conscious of his animosity.

Instead, neither Attorney Potter nor Attorney Wozniak explained to Mr. Goonan the importance of his constitutional right to an impartial judge. *See* Ex. A at ¶ 9. They did not tell him that the law recognized that Judge White could have a bias against him without being aware of it, or that unconscious bias could be a reason to disqualify him or any other judge in the Oakland federal courthouse. *See id.*

Counsels' errors in this regard fell below professional norms.

Had Mr. Goonan been fully informed of the disadvantages of proceeding with Judge White—particularly about the likelihood of "unconscious bias"—he would not have consented to Judge White presiding over his sentencing and would have asked his attorneys to move for his disqualification. *See* Ex. A at ¶ 11. Thus, the prejudice component of *Strickland* is established. *See Hill v. Lockhart*, 474 U.S. 52 (1985) (to establish "prejudice" in a claim of ineffective assistance of counsel involving a guilty plea, defendant must allege that, were it not for the bad advice to plead guilty, he would have gone to trial).

## III. EVEN IF MR. GOONAN HAD WAIVED HIS RIGHT TO AN IMPARTIAL JUDGE (WHICH HE DID NOT), A BIASED JUDGE MAY NOT EXERCISE DISCRETION IN SENTENCING AND THE RESULTING PREJUDICE TO MR. GOONAN IN HIS EXCESSIVE SENTENCE IS CLEAR

Even if Mr. Goonan had properly waived his right to an impartial judge—which he did not, due to his counsel's failures as discussed above—a biased judge may not exercise discretion in sentencing. Rather, as the Ninth Circuit has indicated, a biased judge may only sentence a

defendant to a stipulated/agreed-to[7] sentence between the government and defendant. For example, in *Reeves v. Belleque*, No. CV 05-505-MA, 2010 WL 3418121 (D. Or. Aug. 23, 2010), Walter Reeves challenged his sentence via a habeas petition pursuant to 28 U.S.C. § 2254 after pleading guilty in Oregon state court. He asserted that "he was denied the right of due process when the judge failed to recuse herself after acknowledging that she was prejudiced against petitioner and his brother [William] after their attempted escape from the courthouse." *Id.* at *7. His brother, William, had filed a similar petition that the district court denied years earlier, and on appeal, the Ninth Circuit had rejected William's argument that the admitted bias of the sentencing judge constituted a reversible structural error—specifically because "no 'clearly established Federal law' speaks to whether due process requires an impartial judge *for the acceptance of a stipulated plea and sentence*." *Reeves v. Belleque*, 214 Fed. Appx. 667, 668 (9th Cir. 2006). In affirming the denial of William's petition, the Ninth Circuit noted that even if such a right did exist, William had not identified any law indicating that it cannot be waived. *Id.* Years later, the Oregon district court similarly denied Walter Reeves's habeas petition, finding that his case was "indistinguishable" from his brother William's case:

> Prior to accepting the petitioner's plea, Judge Orf engaged in a lengthy discussion with petitioner and his brother, as well as defense counsel and the prosecutor. (Resp.Ex.104, p. 5.) Judge Orf explained prior to acceptance of the plea that she was biased against petitioner because of his attempted escape and the injuries caused to courthouse staff. (*Id.*) The judge noted that "the only way" she was willing to accept the plea was if she would not be exercising discretion in sentencing petitioner. Petitioner

---

[7] Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure provides a mechanism for a stipulated/agreed-to sentence: "If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will: . . . agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement)."

> acknowledged that he understood. (*Id.* at 6.) Judge Orf also stated that she had agreed to be bound by the negotiations between the parties, and petitioner acknowledged that he understood. (*Id.*) Continuing, Judge Orf then specifically inquired whether petitioner wanted to proceed, "knowing where the Court's coming from" and again, petitioner agreed. (*Id.*)

*Reeves*, 2010 WL 3418121, at *9.

Here, by contrast, Judge White engaged in no discussion whatsoever with Mr. Goonan regarding Judge White's bias, including any potential bias or appearance of bias. The principle that a biased judge should only be able to sentence a defendant if the judge would not be exercising discretion in sentencing, was never raised or explained to Mr. Goonan, either by the Court or his attorneys. Although the government raised the potential conflict at Mr. Goonan's initial appearance on July 11, 2024, and Magistrate Judge Ryu responded that "we don't have a conflict problem," Judge Ryu was only speaking for herself, not Judge White. Moreover, she made that statement in the earliest stage of the case, before discovery began, and before Mr. Goonan's trial counsel even appeared in the case. AUSA Bhagat even acknowledged that he was "not concerned that your Honor has a conflict, but I know that the canons are very, sort of, broad, and they talk about appearance of – that the impartiality might reasonably be questioned. So I wanted to just bring it to the Court's attention, so that the Court had all the facts to make its own decision." Ex. B at 11:6–14:10. This is why Judge Ryu then ordered the parties to submit to the Court in writing their positions on the issue by July 16. In an email to AUSA Bhagat on July 15, Mr. Goonan's soon-to-be-retained attorney, Sarah Potter, punted the recusal issue, writing that "we do not intend to address detention at the moment so I think that sort of moots the recusal issue." Bhagat then filed a letter dated July 15 with the Court on July 17, stating that "Mr. Goonan's counsel has advised that Mr. Goonan intends to waive pretrial detention at the status conference on July 18. Given that intention, Mr. Goonan's position is that Your Honor need not

consider or decide this issue until and unless at some future date, the Court reopens the detention hearing pursuant to 18 U.S.C. § 3142(f)(2).” The reason the bias issue would have been relevant if a detention hearing had happened is because the Court would have had to exercise discretion in deciding on whether Mr. Goonan should be released or detained. A detention hearing never happened, and the issue was never raised or discussed again before the Court. More than a year later, at Mr. Goonan’s sentencing, Judge White did not hold back in making his bias against Mr. Goonan abundantly clear, which was a shock to Mr. Goonan. Bhagat had written in the July 15, 2024 letter to Judge Ryu that, “[p]articularly given that there is no evidence that Mr. Goonan’s actions were aimed specifically at the Court or the judiciary, the government does not believe that Your Honor’s presiding over the detention hearing in this case would create an appearance of impropriety.” Yet, at Mr. Goonan’s September 23, 2025 sentencing, Judge White made clear that he viewed Mr. Goonan’s case as “one of the most serious series of crimes that I have seen” particularly because it involved an “assault on . . . ***this very courthouse***.” Ex. I at 20:21-24 (emphasis added).

The resulting prejudice to Mr. Goonan is clear in the excessive sentence Judge White imposed and the statements the judge made immediately prior to imposing it. Pursuant to 18 U.S.C. § 3553(a), in determining the particular sentence to impose on a defendant, federal district judges are required to consider the following sentencing factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the [Sentencing Commission's] guidelines—

. . .

(5) any pertinent policy statement—

. . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) begins with the directive that "[t]he court shall impose a sentence ***sufficient, but not greater than necessary***, to comply with the purposes set forth in paragraph (2) of this subsection." *Id.* (emphasis added).

Judge White, however, due to his strong bias against Mr. Goonan, failed to adequately consider the Section 3553(a) sentencing factors and imposed a sentence that was "greater than necessary." Judge White explicitly admitted his bias when discussing the first sentencing factor—the nature and circumstances of the offense and the history and characteristics of the defendant. Regarding the offense, Judge White stated that, "in over 20 years on the bench, this is one of the most serious series of crimes that I have seen," because "[i]t is an assault on our – attempted assault on our educational institutions, on this very court – this very courthouse. They were callous. They were – they could have resulted – as Government Counsel argues and is

correct – the maiming of some of our federal officers and other bystanders. In his fleeing, it could have resulted in firearms being used by authorities. It's extremely dangerous actions on the Defendant's part." Ex. I at 20:19–21:4. Judge White's mention of "our federal officers" and Mr. Goonan's "fleeing" is a clear reference to the June 11, 2024 incident, which was the only one that involved federal officers and Mr. Goonan fleeing as described by the government during its sentencing argument. *See* Ex. I at 5:22–6:18 (AUSA Bhagat describing how on June 11 Mr. Goonan "comes to this building" and during his attempt to firebomb it "is interrupted by the protective security officers here – who in this case played a really heroic role . . . ."). Judge White was clearly most focused on and disturbed by the June 11 incident, the only incident about which he stated any specifics. The rest of Mr. Goonan's criminal acts were addressed by Judge White in passing in just two brief, generic sentences:

> And I also look at how many criminal actions were shown by the record, how many, if you will, bad acts. In this case there are multiple bad acts on multiple occasions, cowardly acts that this Defendant committed without – with reckless disregard for life or property.

Ex. I at 21:5-9. Judge White did not go into any detail whatsoever about the other four acts; he did not even mention the June 1 police car firebombing that was the basis of Mr. Goonan's conviction and was the only crime he was charged with in this case.

Judge White was particularly impassioned in court when emphasizing that Mr. Goonan's criminal conduct included an assault on "this very courthouse," the one in which Judge White had sat for over two decades. This personal bias and emotional investment in Mr. Goonan's fate led Judge White to see Mr. Goonan's criminal acts in an excessively unfavorable light, resulting in his 235-month sentence that was demonstrably "greater than necessary" as evidenced by the fact that it was nearly four years longer than the government's own request; nearly five years

longer than the Probation Office's request; and just five months short of the statutory maximum—which also meant that Mr. Goonan received no benefit from his U.S.S.G. § 3E1.1 three-level reduction for early acceptance of responsibility. *Cf. Daniels v. United States*, No. 4:23-CV-04142-KES, 2024 WL 6845366, at *17 (D.S.D. Apr. 30, 2024), *report and recommendation adopted*, No. 4:23-CV-04142-KES, 2024 WL 6845361 (D.S.D. May 30, 2024) (denying Daniels's Section 2255 motion on the basis that Daniels failed to show deficient performance by his trial counsel or prejudice resulting because "Mr. Daniel[s] has not posited how he thinks the result of his case would be different if his lawyer had successfully moved to have another judge assigned for sentencing. ***The district court varied downward from Mr. Daniels' USSG range, an indication contrary to Mr. Daniels' assertion of bias.*** . . . [T]he only supposed evidence of bias Mr. Daniels can point to is not the outcome of his case, but the sentencing court's childhood and familial connection to the location of Mr. Daniels' crimes stated by the court at the hearing. That is not enough under *Strickland* to show prejudice, ***especially when the sentencing court was arguably more lenient in imposing sentence than was necessary***.") (emphasis added).

In contrast to his impassioned emphasis on the nature and circumstances of the offense, focusing almost entirely on the June 11, 2024 attack on the federal building and courthouse, Judge White gave very short shrift to "the history and characteristics of the defendant." 18 U.S.C. § 3553(a). Mr. Goonan's counsel spent nearly the entirety of her sentencing argument focused on Mr. Goonan's mental health struggles, and submitted in support a 24-page report from forensic psychiatrist Dr. Jeff Gould, who concluded after evaluating Mr. Goonan in May 2025 that his behavior at the time of his crimes in June 2024 "was substantially caused by his psychiatric disorder" and that "[h]is risk for future violence is very low when not suffering from

symptoms of his psychiatric disorder." Dkt. 65-2, Exhibit B to Goonan Sentencing Memorandum (filed under seal) at 12-13. In fact, Mr. Goonan had been in such a severely unstable mental state just two weeks before the first criminal act in this case—the June 1, 2024 police car firebombing—that he was hospitalized on May 15, 2024, where he was sedated and placed on a 5150[8] hold for psychosis. *See* Dkt. 65 at 5. He was transferred to a psychiatric hospital the next day and formally diagnosed with bipolar disorder and obsessive-compulsive disorder, but left the hospital against medical advice after three days. *See id.*; Dkt. 65-2 at 3.

Judge White, in turn, gave barely a *minute* of attention to Mr. Goonan's well-documented mental health struggles that contributed to his crimes. Judge White stated that "he has had some challenges in his life, which I'm not going to go into in detail but they are chronicled in the pre-sentence report and in some of the writings and memos. And also he has a – you know, as the record indicates and as Counsel argues, some mental health challenges to – for him." Ex. I at 20:11-15. "I have no doubt that this Defendant has mental challenges. And maybe, maybe, those mental challenges resulted in the loss of impulse control by this Defendant, which enabled him to commit these crimes. I'm one that thinks in most cases – not in all cases – people who commit terrible crimes do so because there's some issue with their mental health that perhaps law-abiding citizens do not have. But I have no doubt that this Defendant knew exactly what he was doing at every moment that he was doing it and intended to create an air of fear and danger in our community." *Id.* at 21-10-20. That is the entirety of Judge White's attention to Mr. Goonan's extensively documented mental health issues, and notably the judge's language again focuses on the "air of fear and danger ***in our community***." *Id.* (emphasis added).

---

[8] 5150 refers to involuntary commitment "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to themselves, or gravely disabled, . . . ." Cal. Welfare & Institutions Code § 5150.

Judge White's bias also led him to overlook the *28* letters of support submitted by Mr. Goonan's family, friends, colleagues, and other community members. *See* Dkt. 65-1, Exhibit A to Goonan Sentencing Memorandum. While Judge White described Mr. Goonan as having a "hatred of society and the community," these letters from dozens of reputable community members who knew Mr. Goonan personally before his arrest overwhelmingly describe Mr. Goonan as the complete opposite—as a kind and generous person who not only cares deeply for others and has an abounding love for community, but devoted his life to the hard work of serving the most marginalized and vulnerable members of our society; and to building a more just and humane world free of government oppression, violence, war, and genocide. *See* Dkt. 65-1; Dkt. 65 at 6-7.

Judge White's sentence was clearly unreasonable and motivated by his strong personal, impermissible bias against Mr. Goonan. A sentence is procedurally unreasonable if the sentencing court committed such errors as "treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence," *Gall v. United States*, 552 U.S. 38, 51 (2007), or if a court failed to "consider all non-frivolous arguments in support of a lower sentence," *United States v. Gunter*, 620 F.3d 642, 645 (6th Cir. 2010). If a reviewing court is satisfied that a sentence is procedurally reasonable, it may then consider its substantive reasonableness. A sentence is substantively unreasonable "if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (citation omitted). Sentences that fall within the properly calculated

guidelines range are presumptively considered reasonable, though the presumption can be rebutted. *See United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

Even though the 235-month sentence Judge White imposed was within Mr. Goonan's Guidelines range, it was based on impermissible factors and the Guidelines range overstated the appropriate sentence for Mr. Goonan—as both the government and the Probation Office recognized in their sentencing recommendations. Importantly, Mr. Goonan had no prior criminal history and no prior history of violence or arson. Judge White's 235-month sentence, which is just five months short of the statutory maximum for Mr. Goonan's arson conviction, also meant that Mr. Goonan received no benefit from his U.S.S.G. § 3E1.1 three-level reduction for early acceptance of responsibility. In *United States v. Blanco*, 102 F.4th 1153 (11th Cir. 2024), the defendant, Mr. Guerra Blanco, had pled guilty to "attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. 2339B(a)(1)." *Id.* at 1157. The U.S.S.G. § 3A1.4 terrorism enhancement was also applied in his case, resulting in a Guidelines range of 360 months to life; but because the statutory maximum for his offense was 240 months, the Guidelines range also became 240 months pursuant to U.S.S.G. § 5G1.1(a). The district court considered Mr. Guerra Blanco's acceptance of responsibility to be a mitigating factor under Section 3553(a), among others, in varying downward 48 months, from 240 months to 192 months. *See id.* at 1168. On appeal, Mr. Guerra Blanco challenged the application of the terrorism enhancement in his case, but the Eleventh Circuit affirmed his sentence, finding that it was substantively reasonable:

> The district court considered Mr. Guerra's offense to be very serious, and believed it required a significant sentence. Nevertheless, it varied and departed downward 48 months below the 240-month statutory maximum sentence after expressly considering and weighing the § 3553(a) factors. We find no abuse of discretion with respect to substantive reasonableness.

*Id.* In so doing, the Eleventh Circuit recognized that the district court had properly acknowledged Mr. Guerra Blanco's three-level reduction for early acceptance of responsibility:

> In [*United States v.*] *Rodriguez*[, 64 F.3d 638 (11th Cir. 1995)]—a case decided when the Sentencing Guidelines were still mandatory—we held that a district court may, in its discretion, depart downward if the reduction for acceptance of responsibility gives the defendant no actual benefit because the guideline sentence far exceeds the statutory maximum. *See id.* at 643. We came to this conclusion because we thought that "the [Sentencing] Commission failed to consider that [U.S.S.G.] § 5G.1(a) [which provides that where the statutory maximum sentence is less than the low end of the guideline range, the statutory maximum sentence becomes the guideline sentence] might operate to negate the [U.S.S.G.] § 3E1.1 [acceptance of responsibility] adjustment and undermine the 'legitimate societal interests' served by the adjustment." *See id.*

*Id.* 1167. In Mr. Goonan's case, the terrorism enhancement gave Mr. Goonan a Guidelines range of 235–293 months, such that its application also increased his Guidelines range beyond the statutory maximum for Mr. Goonan's offense; the low end of the range was essentially at the statutory maximum (240 months). Judge White sentenced Mr. Goonan to the low end of the Guidelines range, but that range already represented an overstatement of the appropriate sentence in his case.[9]

---

[9] Mr. Goonan is not challenging the application of the terrorism enhancement in his case. As this motion makes clear, he is only challenging his excessive sentence, not his guilty plea or plea agreement. He continues to take full responsibility for his actions. However, it is important to recognize that the terrorism enhancement is widely considered to be a draconian one-size-fits all increase lacking any empirical basis or ties to Section 3553(a). *See* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Inequality 51, 57-58, 108, 112-15 (2010). Judge Breyer, acting chair of the Sentencing Commission, recognizes that guidelines "should be based, above all, on empirical data." *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1012 (N.D. Cal. 2019). He sets out in detail how the terrorism adjustment's automatic CHC VI is "inappropriate" because it is not tied to the seriousness of the offense and does not reflect empirical risk of recidivism. *Id.* at 1013-14. He notes that courts cite no authority when they recite that terrorists are "unique" in their likelihood of reoffending. *Id.* at 1014-15

Finally, 18 U.S.C. § 3553(a)(6) provides that, when sentencing a defendant, the Court "shall consider"—as in, *must* consider—"the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The record shows that Judge White made no such consideration at all, which was a direct result of Judge White's bias and the failures of Mr. Goonan's trial counsel. A review of the sentencings in comparable cases, as well as cases with much more egregious conduct and harm caused, bears this out. For example:

- *United States v. McGowan*, No. 6-cr-60124 (D. Or.)
    - **Offense(s) of Conviction** (guilty plea): Count 1 – conspiracy to commit arson and destruction of an energy facility of the United States, in violation of 18 U.S.C. § 371; Count 2 – arson in violation of 18 U.S.C. § 844(i) and 2; Count 3 – attempted arson in violation of 18 U.S.C. § 844(i) and 2; and Counts 4 through 15 – arson of a vehicle shop, shop and office, and ten vehicles, all in violation of 18 U.S.C. § 844(i) and 2. *See* Dkt. 6-2, Petition to Enter Plea of Guilty, at 2.
    - **Guidelines range** (with § 3A1.4 terrorism enhancement): 360 months to life. *See* Dkt. 16-25, Government's Sentencing Memorandum, at 109.
    - **Government recommendation**: 92 months. *See id.* at 110.
    - **Sentence**: ***<u>84 months</u>*** (60 months as to count 1 and 84 months as to counts 2-15 to run concurrent with count 1 and each other); 3 years supervised release. *See* Dkt. 24.[10]

---

("Repetition of that assertion might give it the ring of truth, but does not make it true."). The available recidivism data suggests that those with little or no criminal history are not likely to reoffend. *Id.* at 1015. "[M]ost importantly," Judge Breyer concluded, "the terrorism enhancement's treatment of criminal history flies in the face of fair, individualized sentencing." *Id.* at 1015-16 (citing and quoting Transcript of Disposition at 69, *United States v. Mehanna*, No. 09-cr-100017 (D. Mass. 2012) (O'Toole, D.J.) (observing that the adjustment is "a fiction," "subversive to the mission of the Guidelines")).

[10] Mr. McGowan was also ordered to pay nearly ***$2 million*** in restitution for multiple arsons. *See* No. 6-cr-60124 (D. Or.), Dkt. 24. By contrast, Mr. Goonan was ordered to pay $94,267 in restitution as his crimes caused much less damage: $89,846 for the police car from the June 1 incident, and $4,421 for the window of the Oakland federal building from the June 11 incident. The other three incidents did not result in quantifiable damage as they involved small fires that were quickly extinguished. "Unless clearly indicated by the guidelines, harm that is merely

- *United States v. Steven Hammond*, No. 10-cr-60066 (D. Or.)
    - **Offense(s) of Conviction** (guilty verdict after jury trial): two counts of use of fire to damage and destroy property of the United States, in violation of 18 U.S.C. § 844(f)(1). *See* Dkt. 204, Government's Sentencing Memorandum, at 10-12.
    - **Guidelines range** (*no* terrorism enhancement): 33 to 41 months. *See id.* at 13.
    - **Government recommendation**: 60 months (mandatory minimum). *See id.* at 2.
    - **Sentence**: ***12 months and 1 day***; 3 years supervised release. *See* Dkt. 210.[11]\
        - Notably, the government appealed Steven Hammond's sentence and the Ninth Circuit vacated and remanded for resentencing, *see* Dkt. 222; the case was reassigned to a different district judge and Steven Hammond was resentenced to 60 months, *see* Dkt. 236. In 2018, however, Donald Trump pardoned him.[12]
- *United States v. Solondz*, No. 5-cr-5828 (W.D. Wash.)

---

risked is not to be treated as the equivalent of harm that occurred." U.S.S.G. § 1B1.3 Application Note 6(B).

[11] Steven Hammond was not ordered to pay any restitution, despite being convicted after a jury trial for multiple arsons, including one that burned 139 acres of public land and endangered his 13-year-old nephew Dusty, who testified against him at trial:

> Witnesses at trial, including a relative of the Hammonds, testified the arson occurred shortly after Steven Hammond and his hunting party illegally slaughtered several deer on BLM [Bureau of Land Management] property. Jurors were told that Steven Hammond handed out "Strike Anywhere" matches with instructions that they be lit and dropped on the ground because they were going to "light up the whole country on fire." One witness testified that he barely escaped the eight to ten foot high flames caused by the arson.

https://www.justice.gov/usao-or/pr/eastern-oregon-ranchers-convicted-arson-resentenced-five-years-prison. *See also* No. 10-cr-60066 (D. Or.), Dkt. 204 at 6-7 ("After his uncle Steven provided him with matches and told him where to start fires, then-13-year old Dusty Hammond became separated from his father Russell Hammond only to find himself alone and surrounded by fire.").

[12] *See* https://www.npr.org/2018/07/10/627653866/president-trump-pardons-ranchers-dwight-and-steven-hammond-over-arson.

- **Offense(s) of Conviction** (guilty plea): Count 1 – conspiracy, in violation of 18 U.S.C. § 371; Count 5 – arson in violation of 18 U.S.C. § 844(i). *See* Dkt. 530, Plea Agreement, at 1-2.

- **Guidelines range** (with § 3A1.4 terrorism enhancement): 235-293 months. *See* Dkt. 535, Government's Sentencing Memorandum, at 7.

- **Government recommendation**: 78 months. *See id.* at 7.

- **Sentence**: ***84 months***; 3 years supervised release. *See* Dkt. 536.[13]

- *United States v. Reznicek*, No. 19-cr-172 (S.D. Iowa)

  - **Offense(s) of Conviction** (guilty plea): conspiracy to damage an energy facility, in violation of 18 U.S.C. § 1366(a). *See* Dkt. 71, Plea Agreement, at 1.

---

[13] Mr. Solondz was also ordered to pay over ***$6 million*** in restitution, *see* No. 5-cr-5828 (W.D. Wash.), Dkt. 536, because he, in the government's words:

> helped destroy the University of Washington Center for Urban Horticulture. . . . Solondz' actions caused over six million dollars in damage, as the entire building had to be scrapped and rebuilt. Solondz' actions placed the lives of firefighters at risk, as they struggled to contain the towering inferno that had engulfed the building. And they had the potential to put other persons at risk as well. Although the arson was timed to occur when no one was expected to be inside of the building, Solondz and his co-conspirators acted without any firm assurance that the building was empty.
>
> Solondz' actions also dealt enormous setbacks to countless professors, researchers, and students, who saw years of hard work and research go up in flames. They destroyed a significant portion of an extensive library, which contained many rare texts and original research materials that could not be replaced. And they terrorized the occupants of the building and members of their families, many of who suffered long-lasting emotional impact from the arson.

Dkt. 535 at 1-2. As part of his plea agreement, the U.S. Attorney's Office for the Eastern District of California agreed that it would dismiss pending charges against Mr. Solondz "relating to the October 15, 2001, arson of the Bureau of Land Management, Litchfield Wild Horse and Burro Corrals in Susanville, California." Dkt. 530 at 7.

- **Guidelines range** (with § 3A1.4 terrorism enhancement): 210-240 months. *See* Dkt. 130, Government's Sentencing Memorandum, at 2.

- **Government recommendation**: 180 months. *See id.* at 1.

- **Sentence**: ***<u>96 months</u>***; 3 years supervised release. *See* Dkt. 134.[14]

* *United States v. Bryan Rivera* (a.k.a. Bryan Lefey), No. 8-cr-107 (W.D. Wisc.)

  - **Offense(s) of Conviction** (guilty plea): destruction of government property, in violation of 18 U.S.C. § 1361. *See* Dkt. 71, Plea Agreement, at 1.

  - **Guidelines range** (with § 3A1.4 terrorism enhancement): 151-188 months. *See* Dkt. 100, Bryan Lefey's Sentencing Memorandum, at 15.

  - **Sentence**: ***<u>36 months</u>***; 2 years supervised release. *See* Dkt. 108.[15]

* *United States v. Tre Arrow* (a.k.a. Michael Scarpitti), No. 2-cr-440 (D.S.D.)

  - **Offense(s) of Conviction** (guilty plea): two counts of arson, in violation of 18 U.S.C. § 844(i). *See* Dkt. 41, Plea Agreement, at 1.

---

[14] Ms. Reznicek was also ordered to pay over ***$3 million*** in restitution. *See* No. 19-cr-172 (S.D. Iowa), Dkt. 134. The government described her conduct as follows:

> Reznicek and codefendant Montoya conspired to destroy and sabotage the Dakota Access Pipeline (DAPL) in South Dakota and Iowa. As part of the agreement, Reznicek and Montoya engaged in a series of extremely dangerous actions including using accelerants to set fire to numerous construction vehicles and using an acetylene torch to burn holes in the pipeline. Their actions were calculated to both prevent the DAPL from being constructed, and influence or affect the conduct of the United States government by intimidation or coercion, and/or to retaliate against government conduct.

*See id.*, Dkt. 130 at 1. Still, the court in her case recognized that "the terrorism adjustment overstates the recommended sentence in this case." *United States v. Reznicek*, No. 21-2548, 2022 WL 1939865, at *1 (8th Cir. June 6, 2022). This was so even though the court "also considered her aggravating factors: that she encouraged others to imitate her crimes, that her vandalism caused 'a grave risk to others,' and that her crimes continued over a long stretch of time." *Id.*

[15] Mr. Rivera/Lefey was also ordered to pay over **$420,000** in restitution. *See* No. 8-cr-107 (W.D. Wisc.), Dkt. 108.

- **Guidelines range** (*no* terrorism enhancement): not applicable—the parties agreed to a Rule 11(c)(1)(C) sentence of 78 months, which was binding on the court once the court accepted the plea agreement. *See id.*
- **Sentence**: ***78 months***; 3 years supervised release. *See* Dkt. 44.[16]

- *United States v. Tillman*, No. 25-cr-244-EJD (N.D. Cal.)
  - **Offense(s) of Conviction** (guilty plea): malicious destruction of government property by fire, in violation of 18 U.S.C. § 844(f)(1). *See* Dkt. 27, Government's Sentencing Memorandum, at 1.
  - **Guidelines range** (*no* terrorism enhancement): not applicable—the parties agreed to a Rule 11(c)(1)(C) sentence of 60 months, which was binding on the court once the court accepted the plea agreement. *See id.* at 1-2.
  - **Sentence**: ***60 months***; 3 years supervised release. *See* Dkt. 28.[17]

---

[16] Mr. Scarpitti was also ordered to pay over $150,000 in restitution. *See* No. 2-cr-440 (D.S.D.), Dkt. 44. He admitted to damaging and destroying several cement-mixing trucks in April 2001, and setting fire to, damaging and destroying several logging trucks in June 2001.

[17] Mr. Tillman was also ordered to pay over ***$2.3 million*** in restitution. *See* No. 25-cr-244-EJD (N.D. Cal.), Dkt. 28. The government described his conduct as follows:

> Tillman admitted to intentionally setting fire to the Almaden Valley United States Post Office located at 6525 Crown Boulevard in San Jose, California, on July 20, 2025.
>
> Tillman admitted that he intentionally set the fire in order to "make a point to the United States government." In preparation for the fire, Tillman purchased firelogs and lighter fluid. He then drove to the Post Office with firelogs in his vehicle, backed the vehicle through the building's front door, exited the vehicle, spread lighter fluid throughout the vehicle, threw a lit match into the vehicle, and exited the Post Office. The fire quickly spread from the vehicle to the Post Office, completely destroying its lobby, as depicted in the photographs below. Prior to July 20, 2025, the lobby of the Post Office was open to the public during business hours for retail transactions and access to post office boxes. The fire rendered the lobby unusable, and it has not been available to the public since.

https://www.justice.gov/usao-ndca/pr/man-sentenced-five-years-prison-intentionally-setting-fire-san-jose-post-office. In its sentencing memorandum, the government also detailed that Mr. Tillman recorded a 44-minute video of himself during the arson, in which he:

- *United States v. Smith*, No. 20-cr-187 (E.D. Cal.)
  - **Offense(s) of Conviction** (guilty plea): four counts of arson on federal land, in violation of 18 U.S.C. § 1855. *See* Dkt. 27, Government's Sentencing Memorandum, at 1; Dkt. 69, Judgment, at 1.
  - **Guidelines range** (*no* terrorism enhancement): 27-33 months. *See* Dkt. 65, Defendant's Sentencing Memorandum, at 1.
  - **Sentence**: ***30 months***; 3 years supervised release. *See* Dkt. 67.[18]

---

> explains that he backed his car into the Post Office and set it on fire. He describes this as "an act of terrorism," a "federal crime," and a "felony," and predicts that he will be arrested and brought before a federal judge. He also describes the United States government as "pieces of shit," and says, "I'm here to take them out." Fire engines begin arriving approximately eleven minutes into the video, and Defendant roams out of the shot before returning to speak to the camera again, saying "I should be prosecuted to the highest extent of the law," while firefighters begin fighting the fire in the background.
>
> . . .
>
> Defendant intentionally set a massive fire which caused millions of dollars' worth of damage, destroyed mail belonging to hundreds of people, and could easily have injured or killed firefighters, Postal Service employees, or civilian bystanders.

Dkt. 27 at 4, 7.

[18] Mr. Smith was also ordered to pay over $19,000 in restitution. *See* No. 20-cr-187 (E.D. Cal.), Dkt. 67. The government described his conduct as follows:

> Smith is an admitted serial arsonist who set multiple fires on the Shasta-Trinity National Forest in 2019 and 2020. To avoid detection, Smith used untraceable torches and lighters while starting fires along the Gilman Road area of the national forest, mostly in the early morning hours. He started dozens of fires that threatened people, homes, campsites, interstate highways, and public land during some of California's worst fire seasons on record. Smith denied his guilt when he was arrested, and only later admitted that he set fires despite knowing that arson is extremely dangerous and wrong. Due to the recklessness of his conduct, the frequency of his fires, and the need to deter other arsonists like

- *United States v. Maynard*, No. 21-cr-224 (E.D. Cal.)
    - **Offense(s) of Conviction** (guilty plea): three counts of arson to federal property, in violation of 18 U.S.C. § 844(f)(1). *See* Dkt. 74, Plea Agreement, at 2.
    - **Guidelines range** (*no* terrorism enhancement): 60-63 months. *See* Dkt. 81, Government's Sentencing Memorandum, at 2.
    - **Sentence**: ***63 months***; 3 years supervised release. *See* Dkt. 83.[19]

---

> Smith from starting fires in the future, the Court should sentence Smith to thirty months in prison.
>
> . . .
>
> The assigned probation officer recommended that the Court sentence Smith to thirty-three months in prison because he set no less than eleven fires in and around the Shasta-Trinity National Forest that "endangered a public transportation system, other vehicles, residential homes, and inhabited campsites in vulnerable areas during an already extremely dangerous time."
>
> . . .
>
> Smith is one of the more dangerous arsonists to operate in northern California in recent years.

Dkt. 27 at 1-2, 6 (citation omitted).

[19] Mr. Maynard was also ordered to pay over $13,000 in restitution. *See* No. 21-cr-224 (E.D. Cal.), Dkt. 83. The government described his conduct as follows:

> Maynard set at least seven fires in the summer of 2021, at a time when the State was already battling the Lava Fire and the massive Dixie Fire. While arson is inherently dangerous, especially in drought conditions, Maynard's fires were particularly bad. Not only was Maynard willfully setting fires, the evidence shows he was doing so in order to harm people. Maynard set three of his fires behind the firefighters combatting the Dixie fire, potentially putting those first responders in significant danger. This was deliberate. A search of Maynard's digital devices revealed he was monitoring the Dixie Fire, including the locations of closures, areas of fire spread, and suppression efforts. For some of the fires, Maynard had to drive behind road closures in order to set the fires where he did. With Maynard's fires at their back, the firefighters

By further comparison, the terrorism enhancement has *not* been applied in dozens of recent federal criminal cases arising from protests which involved attacks with lit Molotov cocktails or other incendiary devices that targeted police, police vehicles, and government buildings. *See, e.g., United States v. Turzhanskiy*, No. 12-cr-645 (D. Or.) (lit a Molotov cocktail and threw it at a police car causing a fire next to the car in a parking lot where police officers were present—Guidelines range 37-46 months, sentenced to 30 months); *United States v. Floyd*, No. 17-cr-149 (W.D. Wash.) (constructed Molotov cocktails and threw them at Seattle police officers with one combusting with a police flash-bang device, resulting in burn injuries to an officer; then posted online mocking the officers who had been injured during the protest—Guidelines range 46-57 months, sentenced to 37 months); *United States v. David-Pitts*, No. 20-cr-143 (W.D. Wash.) (during an August 24, 2020 protest in Seattle, started a fire at the East

---

> were effectively surrounded, and had Maynard's fires not been stopped in their infancy by quick action, they could have trapped the firefighters, leaving them no room to escape. It is only because investigators from the U.S. Forest Service were tracking Maynard at this point that those fires were extinguished as quickly as they were.
>
> . . .
>
> Maynard filmed himself attempting to set other, uncharged fires. . . . Maynard's danger extends beyond his penchant for setting fires. In one particularly disturbing incident, Maynard terrorized a mother and her three young children for no apparent reason other than his own enjoyment.
>
> . . .
>
> Maynard's history and characteristics demonstrate that he has long been a dangerous individual. While his most recent convictions are the most serious, Maynard has arrests and convictions dating back over 20 years . . . .

Dkt. 81 at 2 (citations omitted).

Precinct Police Department's sally-port garage door and continued to feed the flames causing damage to the building while officers were inside, as well as throwing a wine bottle at a Seattle police officer—Guidelines range 37-46 months, sentenced to 20 months); *United States v. Channon*, No. 20-cr-129 (W.D. Wash.) (used "an aerosol can and a lighter as a makeshift blowtorch to set fires inside of, and ultimately destroy," five Seattle Police Department vehicles, putting "hundreds of people" in the vicinity "in harm's way if one of the vehicles had exploded,"[20] Guidelines range 51-63 months, sentenced to 60 months); *United States v. Wolfe*, No. 20-cr-181 (D. Minn.) (played a leading role in the near total destruction of the Third Precinct police building by fire in Minneapolis on May 28, 2020, as well as stole police items from the building including a police vest, duty belt, handcuffs, tactical baton, knife, riot helmet, police radio, pistol magazine, and ammunition—Guidelines range 41-51 months, sentenced to 41 months); *United States v. Ziegler*, No. 20-cr-188 (D. Minn.) (constructed Molotov cocktails that contained sharp objects, broke windows with baseball bats to throw in the explosives that then set fire and caused significant fire and water damage to the Dakota County Western Service Center which contained a courtroom in which Ziegler had previously appeared—sentenced to 60-month mandatory minimum for arson); *United States v. Boampong*, No. 20-cr-10321 (D. Mass.) (fired 11 rounds in the direction of police officers (one federal) and civilians as a prohibited person in possession of a firearm, with bullets breaking through the windows of residential apartments—Rule 11(c)(1)(C) plea agreement to a range of 42-63 months, sentenced to 60 months); *United States v. Lung'aho*, No. 20-cr-288 (E.D. Ark.) (sentenced to 66 months for destroying two police cars by setting them on fire with Molotov cocktails, and attempting to

[20] No. 20-cr-129 (W.D. Wash.), Dkt. 76, Government's Sentencing Memorandum, at 3-4.

firebomb another).

Accordingly, Judge White's excessive 235-month sentence must be vacated because it was the product of a biased jurist whom defense counsel inexplicably and ineffectively did not seek to recuse or advise Mr. Goonan about recusal and, as a consequence, was permitted to preside over the sentencing of a defendant who pled guilty to attempting to firebomb the judge's own federal building. As a result of counsel's ineffectiveness and the judge's bias, the judge did not adequately take into account each of the Section 3553(a) sentencing factors, exercised unchecked discretion in sentencing Mr. Goonan, and imposed an unreasonable sentence that must be vacated.

## PRAYER FOR RELIEF

For all the foregoing reasons, and based on any further evidence adduced in these proceedings, Defendant Casey Goonan prays that this Court vacate, set aside or correct his sentence. Alternatively, Mr. Goonan requests that the Court order the government to show cause why he should not be granted such relief, permit discovery and expansion of the record, and set an evidentiary hearing[21] so that he may prove up his claims. He also requests that the Court take

---

[21] Mr. Goonan has a right to such hearing in this matter. "A claim must be so palpably incredible or patently frivolous as to warrant summary dismissal in order to justify the refusal of an evidentiary hearing." *United States v. Howard*, 381 F.3d 873, 877 (9th Cir. 2004) (citations and internal quotation marks omitted). "The standard [for warranting an evidentiary hearing in § 2255 proceedings] essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011). The threshold for such a hearing is "low." *Id.* at 883; *see also United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) ("fairly lenient"); *compare David v. United States*, 134 F.3d 470, 478 (1st Cir. 1998) (concluding no evidentiary hearing warranted because allegations were "so evanescent or bereft of detail that they cannot reasonably be investigated"). Mr. Goonan has met this low threshold with his non-frivolous factual allegations presented herein.

judicial notice of the record from the trial court proceedings, and he incorporates that record by reference.

Mr. Goonan also prays that the Court grant such additional relief as may be appropriate and dispose of the matter as law and justice require.

Finally, Mr. Goonan prays that this case be reassigned to a different district judge, which due to Judge White's demonstrated bias against Mr. Goonan is "advisable to maintain the appearance of justice." *United States v. Kyle*, 734 F.3d 956, 966-67 (9th Cir. 2013).

Dated: October 13, 2026

Respectfully submitted,

/s/ Elisa Y. Lee
ELISA Y. LEE (Cal. State Bar No. 348087)
Attorney for Casey Goonan